**DURKIN v. PET MILK CO.**
**Civ. A. No. 224.**

United States District Court
W. D. Arkansas,
Fayetteville Division.
Oct. 20, 1953.

Stuart Rothman, Sol., William A. Lowe, Chief of Trial Litigation, Washington, D. C., Earl Street, Regional Atty., Harry Campbell, Jr., Dallas, Tex., Asst. Regional Atty., Truett E. Bean, Atty., U. S. Dept. of Labor, Washington, D. C., for plaintiff.

Wade & McAllister, Fayetteville, Ark., Russell Elrod, Siloam Springs, Ark., for defendant.

JOHN E. MILLER, District Judge.

This cause was tried on September 2 and 3, 1953, to the Court upon the pleadings, the ore tenus testimony of witnesses and the exhibits to their testimony, together with requests for admissions filed by the plaintiff herein and the defendant's response thereto, and interrogatories propounded by plaintiff and the defendant's answers thereto, and briefs submitted by both parties, and upon consideration of the same the Court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

### Findings of Fact

#### I.

The plaintiff is the Secretary of the United States Department of Labor and brought this suit in his official capacity.

The defendant is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with a permit to do and doing business in the State of Arkansas, and owns, maintains and operates a place of business, manufacturing plant and offices near Siloam Springs, Arkansas, within the Western District of Arkansas.

The plaintiff is seeking a judgment permanently enjoining and restraining the defendant, its officers, agents, servants and employees from violating sections 6, 11(c), 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. §§ 206, 211(c), 215(a), (1, 2, 5).

#### II.

The defendant is engaged in the operation of a milk processing plant and in the manufacture of canned and evaporated milk at its plant located near Siloam Springs, Arkansas, and in the operation of milk receiving stations located in Paris and Huntsville, Arkansas. Defendant does not own or maintain a dairy herd and does not produce any raw milk but instead all milk used by defendant in the operation of its plant and in the production of canned and evaporated milk is purchased from farmers and dairymen located along designated milk routes extending in and around Siloam Springs, Paris and Huntsville, Arkansas. Most of the raw milk is hauled to the plant, or to the receiving stations, by the persons whose status is involved in this case. The terms, "milk haulers" and "milk route owners", are used to describe these persons. The milk which is hauled to the receiving stations at Paris and Huntsville, Arkansas, is thereafter dumped, weighed, cooled, stored,

and then loaded by defendant's employees into tank trucks owned by defendant and operated by its own employee-drivers, who transport the raw milk to the company's plant at Siloam Springs for further processing.

### III.

The defendant normally employs from approximately eighty-one to about one hundred and two persons in operating its said business and manufacturing plant at Siloam Springs. This number includes the employees within the plant, supervisory personnel, and fieldmen with headquarters at said plant, but excludes the persons whose status is in issue in this proceeding. There is no complaint that the defendant violates the Fair Labor Standards Act with respect to its admitted employees.

All of defendant's admitted employees as well as those engaged in hauling milk to defendant's plant and receiving stations and not admitted to be employees are regularly engaged in manufacturing, transporting, and otherwise in the production of goods for commerce each workweek. It is primarily those persons who are engaged in hauling the raw milk collected from farmers and dairymen throughout the area in question to defendant's plant and receiving stations that are involved in this action.

### IV.

Most of the raw milk used in the operation of defendant's plant at Siloam Springs is transported in trucks from the farms and dairies on which it is produced to defendant's plant by the persons described as "milk haulers" or "milk route owners". Each of these milk haulers operates a numbered route along which the raw milk is received from the various individual producers who have agreed to sell their milk to defendant. Some of the raw milk used by defendant is hauled to its plant by individual producers who transport their own milk. All the milk is bought by defendant from the various producers at a price set by defendant, F. O. B., its plant at Siloam Springs, subject to the milk being accepted by it as meeting certain standards of quality and cleanliness set by the Evaporated Milk Association. The purchase price for the raw milk is posted by the company at its plant at periodical intervals, and is subject to seasonal and other market fluctuations.

A milk hauler transports raw milk from the producers to defendant's plant and receiving stations, and returns the empty milk cans to the producers and when requested by the producer he will deliver supplies to the patrons residing along his route.

### V.

In the same area from which defendant's plant at Siloam Springs draws its supply of raw milk, there are other companies in the same or similar business which compete with defendant for the purchase of raw milk. Among these competitors are Carnation, Borden, Kraft, Milnot, Meadow Gold, various Grade A dairies, and others.

### VI.

The defendant's plant at Siloam Springs was built and commenced operations in 1944. Prior to that date, the company maintained a receiving station at Siloam Springs, from which the raw milk was transported in company-owned tank trucks to its plant at Neosho, Missouri. The basic method of operation by which the company obtains its supply of raw milk has been the same since 1944, and for many years prior thereto. This method is followed in substantially the same manner by defendant in other parts of the country, and has been the general practice and custom of this industry throughout its history.

Defendant for many years has employed persons referred to as fieldmen who are trained by education and experience in the development and care of dairy cattle and herds and in the economical production of high-quality and sanitary raw milk. Defendant has assisted the farmers and dairymen residing in the area in the economical production of high-quality milk through these fieldmen and by making available to them

for purchase top-quality bulls. By this program and by working with the farmers and dairymen through these fieldmen defendant has increased the source of supply of raw milk in the area from virtually nothing at the beginning of its operations to that sufficient to supply all its present needs. In this manner defendant has insured itself an adequate supply of milk without maintaining its own dairy herd.

## VII.

The testimony of the numerous haulers who were witnesses at the trial, the testimony of other witnesses, and the stipulations regarding the testimony of witnesses who were not called, established the following pattern of activity in the origin and operation of the milk routes:

When the defendant entered the area, the farmers were solicited to sell their milk to it. At first the individual producers would bring their own milk to the defendant's receiving stations or plant; then, as both the number of producers and the volume of milk increased, one producer would buy a truck and agree with neighboring producers to haul the milk to defendant. In this way, the various routes became established and acquired general boundaries based not on fixed geographical limits, but rather on the location of the particular producers who had agreed to sell their milk to defendant and contracted with a particular hauler for that transportation service. The route structures developed with the growth of the milk production in the region and, although the particular route boundaries were not fixed by defendant, they were observed by it and for convenience were designated by a number. The ownership of the routes by the individual haulers was recognized by the defendant and producers.

The operation is carried on without written contracts between the parties. The business has been conducted so uniformly for all these years in the area that the practice and custom are well established and understood by all concerned without the requirement of written contracts. The hauler has no contract of any kind, either written or oral with defendant. The hauler has an oral contract, either expressed or implied, with each individual producer on his route by which the hauler agrees to pick up and transport the raw milk to defendant's plant, or to the purchaser to whom the farmer desires to sell his milk. The producer agrees with the hauler on the hauling charge for this service and authorizes the defendant, or other purchaser, to deduct this charge from the check which is issued in payment for the milk. The hauling charge is a rate per 100 pounds of milk accepted at the plant. The form of check which defendant issues to the producer in payment for the milk was offered in evidence as defendant's Exhibit 3. The face of the check shows the deductions made by defendant for the hauling charge, transportation tax, and any other deductions authorized by the producer. Payment for the milk purchased is made every fifteen days, and at the same time, defendant issues a separate check in the amount of the hauling charge payable to the route owner. The payment to the route owner is on a form of check illustrated by defendant's Exhibit 3; this check is in the same form as the check used for the purchase of milk, but is different from the check used by defendant for its labor payroll. (See defendant's Exhibit 5.)

The hauler picks up the milk each morning [1] from the producers on his route, loads the milk cans into his truck and transports them to defendant's plant. Upon arrival at the plant, he unloads the full cans of milk onto a conveyor, which automatically moves the milk cans into the receiving room inside the plant, where the milk is inspected, dumped, weighed, tested, and further processed by defendant. The empty milk cans pass

[1]. In the winter months, November to March, the milk is usually collected every other day, depending on the temperature.

through a mechanical cleaning operation, and are moved automatically on a conveyor out of the plant to a loading dock where they are picked up by the hauler and loaded onto his truck for return to the producer. The haulers do not do any work on company premises other than the loading and unloading of their trucks, and do not do any work inside the defendant's plant. The only occasion for the haulers to enter the plant is to receive messages that may have been transmitted to the plant by individual producers on their route requesting the hauler to pick up some supplies needed in connection with the production of the milk. The hauler spends from 30 to 45 minutes on defendant's premises each day, depending on how many trucks are unloading at a time.

## VIII.

The individual hauler has no fixed time set either by defendant or by the producers for picking up and delivering the raw milk to defendant's plant. This is governed by the distance of the route from the plant, the number of producers on the route, the volume of milk, and the hauler's judgment as to the best time for arrival at the plant in order to avoid congestion in unloading his truck onto the conveyor. Any undue delay in delivering the raw milk to the plant increases the likelihood of the milk becoming sour and being rejected by the defendant as unfit. Defendant does not pay for all milk delivered to its plant but only for the milk which is accepted by it. If the milk fails to meet the standards of quality set by the Evaporated Milk Association, because of sediment, souring, or other cause, it is rejected by defendant. The hauler returns the rejected milk to the producer and neither the producer nor the hauler receives any payment therefor.

## IX.

The producer pays the federal transportation tax imposed upon the hauling activity. The payment is handled by defendant deducting from the producer's semi-monthly milk check the amount of the tax due for the period. This deduction is set out on the check. Defendant then forwards the tax at regular intervals to the Internal Revenue Office with separate returns for each hauler. This method of handling was approved by the Internal Revenue Office.

## X.

Defendant does not fix or control the rates charged the producers by the haulers for the transportation service. It is a matter of agreement arrived at between the producers and the hauler on each route. These rates vary somewhat from route to route, and range from 30 to 50 cents per hundredweight. The rates may be, and are, changed by haulers without prior consultation with defendant. For a time defendant had a requirement that the hauler furnish it a card signed by each producer authorizing the defendant to deduct from the producer's milk check the amount of the hauling charge which had been agreed to. This requirement was later dropped, although some haulers continue to follow the practice of obtaining signed authorizations. While the OPS was in effect, some haulers obtained approval from that agency for an increase in their hauling charge. The rate charged by a hauler on a particular route is a matter of common knowledge in the area. Consequently, when a route changes ownership, the new owner generally takes over at the "fixed" rate. On occasions, a prospective purchaser of a route will consult with a fieldman, or plant employee, of the defendant to learn what the established rate is on a certain route. The rates are affected by competition from haulers who haul milk to other companies. Nearly every route involved here has competition from haulers who were soliciting milk to be hauled to other companies.

## XI.

The milk haulers involved in this proceeding transport all the milk they collect to the defendant. They do not haul to more than one purchaser at a time. There is no agreement between the haul-

ers and defendant in this respect, but it is and has been for years the established practice which is followed without exception. If the producers on a particular route prefer to sell their milk to some other company and have it hauled to another company, there is nothing to prevent the hauler from making such agreement, and thereafter transporting the milk collected on that route to a competitor of defendant in the area. The destination of the milk is determined in the final analysis by the choice of the producer as to the market for his milk.

## XII.

It is the established practice in the industry, and in the operation of the particular milk routes involved here, that a hauler collects milk only from patrons who reside along his particular milk route. A hauler respects the rights of the other haulers and does not attempt to collect milk from a patron selling to defendant who is located on a milk route operated by some other hauler. This practice was not fixed by the defendant, but is a matter of agreement and custom among the haulers themselves. The obligation to respect this agreement is incident to the procurement of a route. The defendant recognizes the ownership of each route by the hauler involved, and the customary method of operation in this respect. Defendant has never attempted to put company employees on a milk route operated by a hauler in order to take the business away from such hauler. On one occasion a route owner hauled a load of milk to a Kraft plant, after telling his producers that defendant would not accept milk from that area any longer; he then abandoned the route and delivered the producers' empty cans to a Kraft hauler. Upon learning of this from a producer who did not believe the route owner, the company had its fieldmen contact the patrons along that route who had been selling to defendant, to tell them the true facts, and to persuade them to continue selling their milk to Pet.

## XIII.

Ordinarily the milk haulers are encouraged by defendant, through its fieldmen, to increase the volume of milk hauled on a particular route by the solicitation of new patrons along the route. The solicitation and acquisition of new patrons by the haulers is an integral part of the normal operation of a milk route, as is the development of the volume of milk that is tendered for transportation. The extent to which the milk route can be developed and additional patrons acquired depend to a considerable extent on the personality, initiative, and salesmanship of the individual hauler. The volume of milk hauled to defendant from a particular route has fluctuated substantially upon changes of ownership of the route and in the personnel operating the route. Whenever a hauler has acquired a new patron on his route who wants his milk hauled to defendant for purchase, such milk is picked up by the hauler and transported to defendant's plant as soon as it is authorized by the producer, without the necessity of prior approval by defendant. Under the Evaporated Milk Association code, the company then has six weeks time for its fieldmen to check the conditions of milk production on the particular farm to see that they comply with the standards set by the industry code. During that period, the company may continue to purchase the milk tendered to it by the new producer until it is determined whether or not the producer meets the established standards.

## XIV.

It is the policy of the defendant, through its fieldmen, to increase the volume of milk available in the area for purchase. There was one exception to this policy in the spring of 1953, when, due to general industry conditions, the management of defendant's plant at Siloam Springs was instructed by the general offices in St. Louis, not to increase the amount of raw milk which was being purchased at the Siloam Springs plant. This was carried out by defendant's field-

men notifying the haulers that they were not to take on any new patrons, except as replacements, until further notice from the company. In spite of this request by defendant's fieldmen, the haulers did in fact take on new producers on their routes, and defendant continued to purchase all the acceptable milk which was transported to its plant at Siloam Springs. This request in the spring of 1953, that the haulers refrain from taking on new patrons, was the only instance of its kind since the establishment of defendant's plant at Siloam Springs in 1944.

## XV.

The fieldmen employed by defendant are all graduates of agricultural colleges. Their duties in general are to assist farmers and potential milk producers in their dairying activities, and to give advice on approved methods of milk production, proper pasture, feed crops, maintenance of barns and equipment, etc. The objective of their activities is to increase the volume and improve the quality of raw milk available for purchase by the defendant in the area where they are assigned. Their activities are similar to the work of a county farm agent, except that it is limited to the dairying industry. In carrying out their duties, the fieldmen are in contact with the haulers, and at times act as liaison men between the haulers and new producers. The fieldmen also may advise particular haulers in regard to their work, the boundary of a route, the hauling charge which is competitive in a particular area, and other matters which are to the mutual advantage of the haulers and the defendant.

The fieldmen do not exercise any control over the haulers, have never tried to discharge an unsatisfactory hauler, and do not interfere with the purchase and sale of milk routes in their territory. In some instances, an individual interested in purchasing a milk route will consult one of defendant's fieldmen to obtain information concerning the route, its mileage, the prevailing hauling charge on the route, the volume of milk being hauled, and the gross income of the route. The fieldmen make this data available, and also assist in finding a seller or a purchaser of a route when requested to do so by the owner of a route, or by someone interested in acquiring a route.

## XVI.

The defendant has a policy of selling dairy supplies at cost to milk producers for the purpose of improving the volume and quality of raw milk available for its plant. The purchase of these supplies is recommended to producers by the fieldmen. In many instances, the producer's order will be transmitted to the company by the hauler, and he will pick up the supplies at the plant and deliver them to the producer when returning the empty milk cans. Defendant does not require the milk haulers to furnish this service to the producers, and no compensation is paid for it, either by the company or by the producers, but it is an established practice of the business. The haulers perform this service for the producers as a part of their hauling business and in the interest of obtaining and maintaining the good will of their customers. The haulers also pick up other items in town at the request of their customers for the same reason.

## XVII.

Meetings of haulers are held several times a year, sponsored by the defendant at which a company fieldman talks to the haulers on business matters. Attendance at these meetings is not compulsory, and they are more in the nature of social gatherings than business sessions, at which the men visit, get a free dinner, and have a good time. Defendant does not give the haulers any instructions at these meetings, but furnishes information on problems relating to the business. The haulers do not now and have never considered themselves under any obligation to attend.

## XVIII.

The equipment needed for the operation of a milk route consists primarily of a truck, generally of one and one-half

or two-ton capacity, with either an open bed or an enclosed insulated bed. The milk cans are owned by the individual producers. The haulers own the equipment they use; the defendant furnishes no equipment whatever to the owners of the milk routes. In all instances the route owners purchase the trucks used in operating their routes from a truck dealer or from each other. The truck beds are also purchased from dealers in that equipment by the route owners or from each other. The supplies needed to operate and maintain the trucks, such as gas, oil, tires, spare parts, etc., are purchased by the route owners from dealers at their discretion. The defendant does not attempt to influence the route owners in any way with respect to where or from whom they purchase their trucks and supplies. However, the defendant does recommend to the haulers that they equip their trucks with enclosed insulated beds which have the advantage of protecting the milk from dirt and impurities and also enable the milk to be kept longer without souring. The use of enclosed insulated beds is not required by defendant, and a number of the haulers do not have such equipment. There was evidence that a statute of the State of Arkansas makes such requirement. As a means of encouraging the use of insulated beds, the defendant has a policy of making loans to haulers for the purchase of insulated beds, and all of such loans are evidenced by a promissory note executed by the hauler, bearing interest at 4½%, and secured by a chattel mortgage on either the bed, the truck, the route, or all three. The haulers are personally obligated for the repayment of such loans, and a payment schedule is provided which requires regular payments at semi-monthly intervals which coincide with the pay periods for the hauling services. (See plaintiff's Exhibits 3, 4, 5; defendant's Exhibits 1, 2, 6, 7.)

The trucks are bought and paid for by the haulers independently of defendant. In the great majority of instances the haulers do their own financing of the purchase of trucks, either by payment in full using their own resources, or by obtaining loans through banks, savings and loan institutions, or other credit agencies. The amounts involved in these transactions range from $700 to approximately $2,700, depending on the age and type of truck involved. Of the 17 haulers who testified at the trial, 14 had financed their purchases of trucks with banks and other credit agencies without the help of defendant. Only three out of the 17, Ferguson, Crittenden, and Robinson, had received loans from the defendant for this purpose. In the three instances where defendant financed a hauler in the purchase of a new truck, the hauler executed a promissory note for the amount of the loan, at 4½% interest, and gave a chattel mortgage on the truck as security for the loan. These chattel mortgages are in the usual form, and are recorded by the defendant in the appropriate county. The loans provided a schedule of regular payments to retire the loan over a period of 12 to 18 months, the installments coinciding with the semimonthly pay periods for the hauling services. These loans, and the loans for beds, are paid off regularly by the borrowers. They are intended to be valid obligations independent of the continuance of the hauling relationship, and are so treated by the parties. The policy of defendant is to make loans frequently for the purchase of an insulated bed, and occasionally for a new truck, where the route owner is not able to obtain outside financing. (Defendant's Exhibits 33, 34, 35.)

### XIX.

The defendant also has a policy of making short term advances to regular route operators when requested for emergency purposes, such as to replace a blown-out tire. This was a fairly common practice. It is not treated as a formal loan, but is in the nature of an advance against the current credit of the hauler's account. No note is taken nor interest charged for this accommodation, but the advances are required to be paid out of the next hauling check issued to the route owner. The defendant also has a policy

of subsidizing various route owners during the winter months by supplementing the hauling check so that it would at least equal 10¢ per mile of route operated. This is done with two or three route owners during the winter months only. It is the defendant's experience that due to seasonal fluctuation in milk production, some routes which had just been taken over by new owners might not survive the winter months. If they are given a little help to carry them into the spring when the milk volume increases, they are more likely to develop into good stable routes, and the subsidy is discontinued. The two or three routes receiving subsidies change from year to year as the routes develop to a point where no help is needed for profitable operation. The defendant has a similar policy of making loans or advances to farmers on graded bulls and quality supplies in order to assist the farmer in increasing his production of quality milk.

## XX.

The route owners pay all the expenses of the operation of their milk-hauling business, such as cost of gas, oil, tires, maintenance and repairs, replacement of parts, etc. In a number of instances the route owner does not drive the truck himself, but hires a driver to operate the route. In such cases, the route owner pays the driver a salary, from which he withholds Social Security taxes and federal income taxes. Route owners deduct Social Security taxes on their receipts as self-employed persons. The route owner pays for such insurance on his equipment as he chooses to carry, and pays for any licenses or permits needed for the operation. In a number of instances the route owner carries cargo insurance to reimburse him for the loss of any milk which may be sustained as a result of collision or overturning while hauling milk. The practice is for the hauler to reimburse the producer for any milk so lost; defendant does not assume any part of this expense.

## XXI.

The defendant imposes no restrictions or requirements upon the route owner in connection with the operation of his route. The route owner is not required to drive his truck personally, and may employ a driver, as many do, or may lease the route to a third person for operation. The hauler can work or not as he sees fit; if he takes days off, he makes his own arrangements for substitute drivers. The route owner has possession of his truck at all times, and may use it for other hauling or any other purpose he chooses. However, the evidence shows that the trucks that are equipped with an enclosed insulated bed are not readily adaptable to the hauling of other bulk supplies. The hauler is not required by defendant to report in or out of its plant at any fixed time. The defendant does not have a dispatcher to control the truck movements, and the haulers are not required to keep any records or file any reports for or with the defendant. The haulers are not required by the defendant to carry insurance or to post bond with defendant, they do not collect or handle money for the defendant, and do not agree to indemnify the company for any damage to the milk they carry, or in the event they cause injury to a third person or to property.

## XXII.

Defendant does not require the route owners to place its name on the milk trucks, or to paint the trucks in any distinctive manner, nor is there any uniform practice among the haulers in this regard. A number of the trucks carry the designation on the body of the truck, "Protected Milk for Pet"; a number of the trucks bear the designation, "Owned and Operated by" followed by the name of the individual route owner. The defendant has a policy of offering to enter into a written advertising agreement with a route owner whereby the route owner would place a decal and lettering on his truck advertising the fact that milk was being transported to defendant. In exchange, the defendant agreed to pay $10.00 per year to the route owner for this advertising. (See defendant's Exhibit 8.) The truck advertising agreement is optional with the route owner,

and it appears that a good many of them did not enter into such a contract.

### XXIII.

The defendant does not issue any written instructions to the haulers for the operation of their routes, nor does it maintain any course for the training or instruction of the haulers in the performance of their activities. The defendant does not give orders to the haulers or tell them how to operate their routes. In the event of a truck breakdown or other emergency, the haulers usually make arrangements among themselves for getting someone to collect and deliver the milk on the particular route. However, it is the practice of defendant to furnish a company-owned truck with a regular employee as driver, to go out and bring to the plant the milk on a route where the milk hauler requests such emergency assistance. In such cases, the defendant charges the hauler 10¢ a mile for the use of the truck, which is considered to be the approximate operating cost. If a company employee is furnished as the driver of the truck, the deduction from the farmer's milk check for the hauling charge is credited to the defendant rather than to the particular route owner. It is up to each hauler to, determine his hauling charge, itinerary, time schedule, number and type of trucks to use, selection of driver if any, source of operating supplies, replacement and repair of equipment, etc.

### XXIV.

The milk haulers have never been classified by the defendant as employees of the company. The defendant does not hire or discharge the haulers. They are not carried on the company payroll as employees, are not included on the company Social Security tax returns, are not covered by the collective bargaining contract which embraces all of the regular employees in its plant at Siloam Springs, are not included in employee group insurance, pension plan, paid vacations, etc. Defendant has never employed drivers whose regular duties were to haul milk from farm to plant, although its tank-truck drivers or other plant employees are sometimes used for an emergency run on a milk route. The relationship between the milk haulers and the defendant has been essentially the same from long before the enactment of the Fair Labor Standards Act to the present.

Therefore, the defendant does not make or keep any record of the number of hours worked per day or per week by the milk haulers delivering milk to its plant at Siloam Springs, Arkansas, or receiving stations in Paris and Huntsville, Arkansas.

### XXV.

The milk routes are recognized in the community as property owned by the individuals carrying on the business. The routes are designated by numbers, and particular routes are bought and sold frequently by individuals in the area, independently of any action by defendant. In many cases a route is sold to a new owner without the knowledge of the defendant. Local banks, other lending agencies, and truck dealers frequently finance the haulers in the purchase of routes and route equipment and take a mortgage on the route itself as security for these loans. The vice-president of a local bank testified that this has been a common practice of his bank for the past fifteen to eighteen years, that to his knowledge, milk routes are frequently bought and sold, and that haulers pay as much as $3,500 for the ownership of a route alone.

There is considerable traffic in these routes as businesses or property with a substantial market value distinct from the operating equipment. Routes have been sold through advertisements in the local newspaper, and have been acquired by inheritance from a deceased owner. (Defendant's exhibits 39, 40, 41). The value of the route depends upon a number of factors, including its location, length, and volume of milk produced thereon, and the sales price varies accordingly. The testimony disclosed a range of sales price on a route alone from several hundred dollars, in the case of an unsuccessful route, to as high as

$3,500 for a successful one. In some instances the purchase and transfer of a route is evidenced by a bill of sale from the seller to the buyer, in others it is an oral transaction. (Defendant's exhibits 36, 38.) The seller usually takes the new owner, or driver, around his route to familiarize him with the customers and their locations.

### XXVI.

In a vast majority of cases the hauler or route owner, has a substantial capital investment in his route and in the equipment needed for its operation. Every hauler owns at least one truck and some of them own two or three trucks for the operation of their routes. Most of the haulers who testified had bought one or more new trucks in the course of operating their routes; these cost from $2,000 to $3,000 per truck. The investment in truck beds ranged from $100 to $680 per bed, depending upon the type of bed used. (Defendant's exhibits 1, 2, 6, 7.) Thus the typical route owner has from $2,500 to $7,000 or more of capital invested in his route and necessary equipment.

### XXVII.

There is a wide range in the value and income of the routes involved in this proceeding. Plaintiff's exhibits 1 and 2 show that the gross receipts in 1952 on the routes varied from a low of $3,613 for route 800 to a high of $8,818 for route 3700. For the pay periods January 1, 1953, through August 15, 1953, the lowest gross receipts on these routes was $2,715, and the highest was $7,151. In some instances during the period covered by this action, particular routes were operated unsuccessfully resulting either in a net loss to the route owner for this period of operation, or in so little profit that he gave up his milk-hauling business. On the other hand, a number of route owners made substantial profits out of their milk routes. Several haulers have accumulated sufficient capital out of the profits of their milk routes to finance their entry into other businesses. One had left a job

paying 90¢ an hour to buy a milk route because he considered that there was opportunity for larger profits in the milk hauling business. The net earning of a hauler depends upon his initiative, judgment or foresight.

### XXVIII.

The success or failure of a particular route depends not only on the location and size of the route, but to a large extent on the initiative, personality and salesmanship of the route owner in acquiring new patrons on his route and in building up a daily volume of milk hauled. This is illustrated by the testimony of hauler W. T. Robinson, that in a little over one year, he had built his route up from about 2,600 pounds to close to 7,000 pounds of milk per day; that he did this through his own efforts in calling on producers and persuading them to give him their hauling business, and by giving his customers the best service he could to secure their good will. Witness Price Jones, a former hauler, testified that he had built route 1800 up from 1,200 pounds to 10,000 pounds of milk a day, and sold that route at a substantial profit. He then bought route 1500, made a net operating profit of $7,000 in 22 months, and sold that route for a capital gain of $1,500.

### XXIX.

The managerial ability is an important factor entering into the selection of a route, the amount paid, the selection and investment in capital equipment and replacements, the choice of drivers for the operation of a route, the consolidation or splitting of routes, the control over operating expenses by careful use and maintenance of equipment, etc. All these decisions are made by the route owners independently of the defendant.

### XXX.

The haulers do not consider themselves to be employees of defendant or that they work for defendant. They regard themselves as independent operators conducting their own businesses which they are free to manage or dis-

pose of as they choose, without interference from the defendant. Most of the haulers live on farms in the vicinity of the milk routes which they operate. The typical route operation is completed somewhere between 11:00 A.M., and 2:00 P.M. Most of the haulers who testified are engaged in farming activities in addition to their operation of a milk route. The route owners who do not drive trucks personally are free for full time work in other occupations.

## Discussion

The able attorneys for the respective parties thoroughly and competently developed every phase of this case in the preparation and trial on the merits. The attorneys for plaintiff on their brief say: "The basic facts in this case are not in serious dispute." Likewise the attorneys for the defendant on their brief say: "On the basis of the record there should not now be any serious dispute over the facts because there was no real conflict of evidence developed at the trial." At the conclusion of the trial the court made a similar statement. The requested findings of fact submitted by both parties along with their briefs reveal that there is no real dispute as to the actual facts. There is, however, a sharp conflict in the inferences drawn by the parties from the evidence and the conclusions reached in the application of the established rules of law to the facts.

The parties are agreed that the sole issue for decision is whether the persons described in the evidence as "milk haulers" or "milk route owners" are employees of defendant under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq.

The plaintiff contends, "Under the facts in this case the milk haulers are employees of defendant within the meaning of the Act." He relies principally upon the definition of the terms "employer", "employed" and "employ" as set forth in Section 3 of the Act, 29 U.S.C.A. § 203, and upon the cases of Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, United States v. Silk and (Harrison v. Greyvan Lines, Inc.) 331 U.S. 704, 67 S. Ct. 1463, 91 L.Ed. 1757, McComb v. McKay, 8 Cir., 164 F.2d 40, and Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 196 F.2d 547.

The defendant contends, "That the persons involved are not its employees, that they are independent contractors engaged in operating their separate businesses of transporting raw milk for farmers to defendant's manufacturing plant where the milk is bought by defendant." And the defendant relies upon Harrison v. Greyvan Lines, Inc., United States v. Silk and Tobin v. Anthony-Williams Mfg. Co., supra.

The various tests as outlined and stated in the above cases have been argued earnestly by the parties, in support of their respective contentions.

The court has not confined its consideration to any one test but has considered the over all relationship of the parties, the circumstances of the whole activity, the purposes of the Act and, when the sum total is considered, is of the opinion that the persons involved herein were and are not employees of defendant within the provisions of the Act.

Therefore, the court concludes:

## Conclusions of Law
### I
The court has jurisdiction of the parties to, and the subject matter of, this cause of action.

### II.
The milk haulers whose status is in issue are shown by the evidence to be independent contractors and are not employees of the defendant within the coverage of the Fair Labor Standards Act.

### III.
The drivers who do not own routes but who operate trucks for route owners are employees of the route owners, and are not employees of defendant under the Act.

### IV.

The plaintiff failed to prove any violation of the Fair Labor Standards Act by the defendant. Plaintiff offered no evidence that there was any violation of the Act by the defendant with respect to its admitted employees and based its case at the trial solely upon the status of the milk haulers, whom the Court finds and concludes to be independent contractors and not employees of the defendant under the Act. Defendant has not violated the Fair Labor Standards Act of 1938, as amended, and in particular no violation was shown of Sections 6, 11(c), 15(a)(1), 15(a)(2) and 15(a)(5). Plaintiff's prayer for judgment and an injunction is accordingly denied and the complaint is dismissed. A judgment in accordance with the above will be entered.