TOBIN, Secretary of Labor, v. CHERRY RIVER BOOM & LUMBER CO.

Civ. A. No. 1170.

United States District Court
S. D. West Virginia, Charleston Division.

Jan. 8, 1952.

William S. Tyson, Solicitor, John J. Babe, Asst. Sol., U. S. Dept. of Labor, Washington, D. C., Paul H. Sanders, Regional Atty., Marvin M. Tincher, Atty., Nashville, Tenn., and Thomas F. Guthrie, Dayton, Tenn., for plaintiff.

Brooks B. Callaghan, Richwood, W. Va., C. H. Welles, Scranton, Pa., for defendant.

MOORE, Chief Judge.

Plaintiff has brought this action praying for an injunction against defendant because of alleged violations of certain provisions of the Fair Labor Standards Act. 29 U.S.C.A. § 201 et seq.

Defendant, as its name implies, is in the lumber and timber business, and carries on extensive operations in southern West Virginia near the town of Richwood. There are approximately 450 persons on its payroll, besides several so-called "contractors" (who plaintiff contends are really employees and not independent contractors within the meaning of the Act), and fifty-odd men employed by the contractors. Defendant transports in interstate commerce substantial quantities of its lumber and timber products, and it is not disputed that it is engaged in interstate commerce.

For the past nine years defendant's operations have been checked from time to time by inspectors from the Wage and Hour Division of the Department of Labor, and as a result of each such inspection defendant complied with such recommendations with reference to its method of doing business as were made by the respective inspectors.

The present litigation involves defendant's relations with the so-called "contractors," its piece-work timber cutters, and the

operators of its woods camps or boarding houses. The facts with reference to each of these classes of workers as shown by the evidence, in which there was little contradiction, may be summarized briefly as follows:

1. *The so-called woods contractors.* For more than 25 years a considerable part of defendant's timber cutting, logging, skidding, and production of ties and mine timbers has been done as a result of written contracts between defendant and various persons who are compensated at specific rates per 1,000 log feet as set out in the respective contracts. The work performed in this way is and has been an integrated part of defendant's total production. These contracts are virtually all in the same form. Among other provisions the contracts contain a statement of the work to be done, where it is to be done, the approximate quality and time of performance, and the price to be paid for each 1,000 log feet. It is provided that if the contractor shall, in the judgment of defendant, fail, neglect or refuse to perform the contract, defendant may take it over and complete it at the cost of the contractor.

Most of the contractors have operated under successive contracts with defendant for several years. With one exception, none have contracts with any lumber company other than defendant. Generally speaking, the various contractors, at the time they begin work under their respective contracts, do not have already assembled either a crew of workmen or an outfit of equipment. However, they furnish their own equipment and employ their own workmen, who range in number from one to eleven men. The equipment consists generally of horses, harness, axes, saws, cant hooks and miscellaneous supplies, most of which are bought on credit from defendant. Those persons whose contracts provide for skidding timber are required to construct at their own expense such roads, skidways and docks as are necessary for the purpose of bringing the timber from the woods and delivering it in ponds provided for that purpose by defendant. Some of the men holding contracts occasionally work alone, and most of the contractors employ not more than five men at one time. Some of the contractors own very little equipment, in some cases hardly more than a team of horses and some saws and axes.

Each contractor supervises the work done under his contract and buys his supplies wherever he sees fit. Defendant exercises little supervision of the contractors other than to designate the particular area of timber to be cut within the contract boundary; to require that the contractor cut all merchantable trees in the area; to direct that portions of the work be slowed down or speeded up according to defendant's needs; to require trees to be cut so as not to waste timber in stumpage; and to prescribe maximum hours for contractors' piece-rate employees, so as to prevent complaint from piece-rate employees hired directly by defendant.

Defendant's personnel manager acts as payroll clerk for all the woods contractors, makes social security and workmen's compensation records for them, compiles all reports incident thereto, and makes various deductions.

Many of the woods contractors have long been continuously indebted to defendant for advances of cash or credit. They meet their operating costs mostly by securing advances from defendant. These advances are covered in part by timber in various stages of delivery and not yet measured; but some of the contractors go further and further into debt with defendant as their work progresses.

On one occasion a contractor, Albert Green, was injured to the extent that he was forced to spend a long period of time in a hospital. Defendant took over his contract, assigned one of its foremen to operate it, and gave Green credit for the proceeds of the operation, charging him with the cost thereof. After his recovery Green continued to work as a woods contractor.

None of the woods contractors undertook to harmonize their own maximum hours or minimum compensation with the provisions of the Wage and Hour Law; and in some cases some of their employees were paid less than the 75¢ per hour minimum wage, and also sometimes worked overtime hours

without being paid therefor at the overtime rate.

In elections held for the purpose of designating the bargaining agent with which defendant should be required to make labor contracts, that is, the union to be certified, defendant recognized employees of woods contractors as being eligible to vote, and after certification required the contractors' employees to belong to the union certified.

2. *Piece-rate employees.* Defendant employs a few (six to twelve) piece-rate timber cutters. These men are paid for their work on the basis of a certain rate per 1,000 log feet. They are at liberty to live where they see fit and to use whatever means of transportation to and from work they please; but they generally stay at defendant's log camps and ride defendant's motor trucks and log trains to and from work along with the hourly-rate employees. These hourly-rate employees usually work a 48-hour week, but they are regularly paid for the overtime at the overtime rate, and their work is not in controversy in this litigation. Prior to the beginning of the trial of this case (which started on June 7, 1951, but was interrupted for the space of more than three months because of other court engagements) no accurate records were kept by defendant's supervisory employees showing the hours worked by the piece-rate timber cutters. About the middle of June, 1951, as a result of the hearing thus far advanced, defendant adopted a policy of having the piece-rate men keep their own time, instructing them that they should not work more than 40 hours per week.

The hourly-rate workers were given credit for the time spent in going to and from work, but the piece workers were not; and there is no evidence that there was ever any custom or agreement to pay them for this travel time. In some instances workers receiving piece-rate pay put in more than 40 hours per week and were not paid for the overtime at the overtime rate. However, I find nothing in the evidence to show that a practice of this kind existed to any substantial extent; and therefore conclude as a matter of fact that such overtime was trivial, and outside the knowledge of defendant.

3. *The camp cooks.* Defendant maintains seven cook houses, but only two of them are in controversy here. These are operated by women, under oral contracts whereby defendant furnishes the building, equipment and fuel, and the cook buys and prepares the food and pays her helpers, who are called "cookees." One of these cooks has as her helper her daughter, a girl in her early twenties who merely lives with her mother and helps her as a member of her family without any contract of employment. Defendant pays $2 per day for each of its employees boarded by the cook. This sum is deducted by the defendant from the employees' wages, and paid to the cook. The cook camps are located in isolated places along defendant's railroad. Sleeping and recreational facilities physically separate from the cook houses are provided by the defendant and cared for by an employee of defendant, known as a "lobby hog," who also assists the cook by performing menial tasks, such as carrying wood and water, etc. The cook and her helper are required to wash and iron towels, linens, and blankets owned by defendant and used by the workmen at the camp. The cooks buy most of their supplies from defendant's store, but are not required to do so. They have on occasion boarded persons other than company employees, such as traveling salesmen, fishermen, hunters and miners. Their contracts do not require them to account for their receipts or expenses in connection with this type of service.

The same employee of defendant who keeps records for the woods contractors performs the same service for the cooks. In neither case is he paid anything for this type of work.

The cooks work long hours (greatly in excess of 40 hours per week) without receiving any overtime pay, because they have always been considered to be independent contractors. The "cookees" have in many instances been paid less than the minimum wages prescribed in the Act, and have worked more than the maximum hours.

On one occasion during the period covered by the evidence one of the cooks, Mrs. Coe, took a vacation for approximately

three months, during which time she received the proceeds which accrued from the cooking operations at the camp where she was cook. There is nothing in the evidence to indicate that any person in the position of cook might not hire all the work done, while she herself merely supervised the operation.

From the foregoing facts, it is contended by plaintiff that all the persons whose status is in controversy here are employees of defendant, and that as to such persons the defendant is subject to the requirements of the Fair Labor Standards Act with reference to minimum wages and maximum hours as well as the keeping of accurate records. Defendant concedes that the piece-rate timber cutters, as well as a few of the so-called woods contractors occupy the status of employees; but says that it is now in full compliance insofar as the piece-rate cutters are concerned, and that as to the so-called contractors whom it now concedes to have been in effect employees, most of them are no longer working, and as to those who are still working defendant intends to comply with all the provisions of the Act.

It is my conclusion that under the facts and circumstances developed in this case with reference to each of the so-called woods contractors whose status is questioned by plaintiff, the following persons are in fact independent contractors and not employees within the meaning of the Fair Labor Standards Act: I. R. Hamon, Joe Roberts, L. A. Ramsey, S. A. Young, John Smith and Ray Smith, Erman Milam, Albert White and Albert Green. On the other hand, I conclude that certain persons who have been designated by defendant as contractors are in reality merely employees, and as such entitled to the benefits of the Fair Labor Standards Act: Grafton Short, Paris Cogar, Joe Rinaldi, George Key, Lanty Boggs, David Fisher, Olla Arbogast, Norman Sharpe, and N. J. Lowther.

██ The distinction between these two classes of persons is by no means well defined; but it seems reasonably clear that a distinction does exist, and should be recognized. If all the persons named in the first list were to be classified as employees for the purposes of the Act, then who could ever be a contractor in a timber operation? These men furnished their own equipment; employed their own workmen; constructed their own facilities, often at large cost to themselves; were not required to work personally unless they saw fit; and enjoyed the opportunity to make substantial profits from their operations if their work was efficiently and economically managed. On the other hand, it is clear that if an employer were permitted to get his work done by means of men who are given small, nonlucrative contracts, but who are not required to furnish anything substantial in the way of equipment, or to employ a sizeable force of workmen, or to lay out money to facilitate the performance of the work; and if such an employer were permitted, merely by bestowing the title of "contractor" upon such workmen, to escape the obligations towards employees imposed by the Fair Labor Standards Act, the beneficent purposes of the Act could be thwarted by unscrupulous employers. Of the persons included in the second list, the work of many of them, particularly those whose contracts were for the cutting of mine ties, props and headers, can scarcely be distinguished from that of the piece-rate cutters, who are concededly employees. All in this list owned such scanty equipment and employed such a meager force of helpers that they can hardly be said to have had a substantial financial interest in their respective contracts. Moreover, as already said, defendant now concedes that many of them were, and if still working are, actually employees and not independent contractors within the intent of the Act. See Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633. I believe that they have few of the attributes which distinguish independent contractors from employees within the meaning of the Fair Labor Standards Act, and have therefore placed them in the latter category.

Since it has been conceded by defendant that the piece-rate timber cutters are employees and not independent contractors,

768

it is unnecessary to announce any further conclusion with reference to them, other than that the defendant is now in compliance with the Act insofar as the piece-rate timber cutters are concerned, and that there is no reason to expect that there will be any future violations in that regard.

I conclude further that the two camps in controversy here are necessary parts of defendant's operations; that the cooks at the camps perform their work in interstate commerce; and that they are consequently within the purview of the Fair Labor Standards Act. Hawkins v. E. I. Du Pont de Nemours & Co., 4 Cir., 192 F. 2d 294; Consolidated Timber Co. v. Womack, 9 Cir., 1942, 132 F.2d 101; Hanson v. Lagerstrom, 8 Cir., 1943, 133 F.2d 120. While ostensibly engaged under a contract and heretofore considered as independent contractors, it is my opinion that the cooks and "cookees" are actually employees of defendant. It is true that they buy their own supplies, are paid at a designated rate per boarder, and have the right to take in outside boarders and to absent themselves personally at times from the camps; and it cannot be gainsaid that these circumstances of the employment point to the status of independent contractor. However, where it is shown as here that the maximum benefits that can be expected by the cook and her helpers from this sort of arrangement are less than would accrue to them from outright employment under the wage and hour restrictions of the Act; and when as here the arrangement appears from the circumstances to be intended for the benefit of the employer in limiting his outlay, rather than for the benefit of the cook-contractor (who is given little opportunity to make of the contract a profitable business venture), the surface appellation of "contractor" must be stripped off to uncover the real relation of the parties, which for the purposes of the Act I find to be that of employer and employee. Rutherford Food Corp. v. McComb, supra; N. L. R. B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; Southern Railway Co. v. Black, 4 Cir., 1942, 127 F.2d 280.

The evidence convinces me that such violations as are shown now to exist have occurred not from any intention of the employer wilfully to disregard the law, but from a justifiable belief that the law did not affect these controversial phases of its business. Therefore I do not believe that there is reason to expect that defendant will in the future violate the Fair Labor Standards Act in any of its phases with reference to the matters determined in this case. However, plaintiff is entitled to the coercive processes of this Court to compel defendant to bring its operations into compliance with the Act. An injunction may therefore issue requiring defendant to bring into compliance with the Fair Labor Standards Act its operations, including the keeping of accurate records, insofar as they concern the persons heretofore designated as "contractors," but who are in fact employees, as hereinbefore set out, as well as any other persons now or hereafter engaged in doing the same type of work in substantially the same circumstances; which such employees, together with the piece-rate timber cutters, are hereby declared to be entitled to all the benefits of the Fair Labor Standards Act with respect to minimum wages and maximum hours.

Since I have concluded that defendant did not wilfully and intentionally violate the Act, I believe it ought not to be compelled to operate permanently under a court injunction. The injunctive forces of the court should be used sparingly in dealing with legitimate businesses. In cases such as this, involving at the most a venial culpability, the iron hand of judicial power may well be relaxed when the negligence is admitted and the damage repaired. Therefore, whenever the defendant may show to the satisfaction of the court after notice to plaintiff and opportunity given to rebut the showing made, that it is in full compliance with all the provisions of the Fair Labor Standards Act, I will entertain a motion to dissolve the injunction.

Costs in this action will go against defendant.

An appropriate order may be entered, carrying into effect the conclusions herein announced.