W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Martin K. KNEECE, Eugene H. Kneece, R. H. Kneece, and George A. Townes, Jr., d/b/a Aiken Lumber Company, Defendant.

**Civ. A. No. AC–1742.**

United States District Court
D. South Carolina,
Aiken Division.

Jan. 19, 1966.

Charles Donahue, Sol., Beverley R. Worrell, Regional Atty., Joe D. Sparks, Atty., U. S. Dept. of Labor, for plaintiff.

Henderson, Salley & Cushman, Aiken, S. C., for defendant.

SIMONS, District Judge.

Plaintiff instituted this action by filing his complaint with the clerk of court June 30, 1965, alleging that during the period since July 28, 1962, defendants have violated the minimum wage,[1] overtime,[2] and record-keeping[3] provisions of the Fair Labor Standards Act, as amended, in reference to their employees engaged in various aspects of the lumber industry. Plaintiff also alleges that during the period since July 28, 1962, defendants have violated Section 15(a) (1) of the Act [29 U.S.C. § 215(a) (1), commonly referred to as "hot goods" provision] which provides in part that "it shall be unlawful for any person to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title."

Plaintiff seeks judgment enjoining and restraining defendants, their agents, servants and employees from violating the aforesaid provisions of the Act.

Defendants, in their answer, admit that they are engaged in the lumber business in Aiken, S. C., and that some of the lumber manufactured by them is shipped in interstate commerce.

The case was tried without a jury September 30–October 1, 1965, in accordance with the amended pretrial order filed September 30, 1965.

As stated in the pretrial order plaintiff generally claims that persons working at portable sawmill sites separately operated by Lawrence E. Fincher, Harmon A. Fincher and Geddings Willing are all employees of Aiken Lumber Company within the meaning of Section 3 of the Act [29 U.S.C. § 203]; and are and have been employed since July 28, 1962, in violation of the wage provisions and record-keeping provisions of the Act. Defendants allege that the Finchers and Willing are independent contractors, and that neither they nor their crews are employees of Aiken Lumber Company; and that defendants have not violated any provisions of the Act which would warrant issuance of an injunction by the court.

At the commencement of the trial, the court permitted plaintiff to present testimony and evidence on the issue of violation of the "shipping" provisions of the Act with defendant having the right to present testimony or cross-examine any witness with respect to this issue at a later date, since this issue had not been pressed by plaintiff prior to the date of trial. The court was informed by counsel for defendant subsequent to the trial that no further hearing in regard to this issue was desired by defendants.

The questions for determination by the court are as follows:

1) During the period from July 28, 1962, to date were the Finchers and Willing and the men working at their portable sawmill sites employees of Aiken Lumber Company within the meaning and intent of the Fair Labor Standards Act, as amended;

2) If these men are not employees of Aiken Lumber Company, has the lumber company violated the "hot goods" provi-

---

1. 29 U.S.C. §§ 206 & 215(a) (2).

2. 29 U.S.C. §§ 207 & 215(a) (2).

3. 29 U.S.C. § 211(c).

sion of the Act [29 U.S.C. § 215(a) (1)] by knowingly shipping lumber in interstate commerce produced by workers who have been paid less than the wages prescribed by the Act;

3) Should this court enjoin and restrain defendants from violating the Act?

## I. ARE LAWRENCE E. FINCHER, HARMON A. FINCHER, GEDDINGS WILLING AND THEIR CREWMEN AT THE PORTABLE SAWMILL SITES EMPLOYEES OF THE DEFENDANT, AIKEN LUMBER COMPANY?

Defendants Martin K. Kneece, Eugene H. Kneece, N. H. Kneece, and George A. Townes, Jr., at all times pertinent to this action, resided in Aiken County, South Carolina, where they are partners in the lumber manufacturing business operating under the firm name and style of "Aiken Lumber Company", hereinafter referred to as the defendants. They own two portable sawmills. These mills have been rented by Geddings Willing, and until January 1, 1965 by Lawrence Fincher. Subsequent to this date Lawrence Fincher's brother, Harmon, took over the operation of the portable sawmill theretofore operated by Lawrence. Willing has operated one of the portable sawmills since 1946, and Lawrence Fincher began the operation of the other mill about 1956. Lawrence and his brother Harmon operated the portable sawmill under substantially similar conditions and hereinafter the operations of both of these mills will be referred to as the Willing and Fincher Mills.

Under the usual procedure of their operation defendants acquire rights to standing timber from various landowners. Thereafter they enter into an agreement with Willing and Fincher to cut the standing timber, saw the trees into rough lumber, and deliver the sawn rough lumber to its planer mill in Aiken, South Carolina at a variable agreed rate per thousand board feet. Such delivered price varies with the location of the timber from Aiken, the grade of trees, logging conditions, topography of the timber

site, and other variable conditions affecting the cutting and logging operations. The price averages about $25.00 per thousand board feet of lumber, varying $2.00 up or down dependent upon conditions aforesaid. After the trees are cut and sawed into rough lumber, Willing and Fincher deliver the rough boards to the lumber company for processing, drying, planing, and sale.

Willing and Fincher employ crews of approximately 18 and 10 employees, respectively. They have complete supervision, and hire and fire at will all of their employees. Defendants have never exercised nor attempted to exercise any control over the relationships between Fincher and Willing and their workers at the sawmills. These men have had at all times sole and complete control over their workers with regard to wages paid, hours worked, time off, days worked, etc. No representative of the lumber company has been present at the job sites except to request that particular sized boards be cut so that specific orders for lumber could be filled. Willing and Fincher have exercised total supervision over the day-to-day employment of the crews operating the portable mills.

The two portable mills, although owned by defendants, are leased to Willing and Fincher. However, Willing and Fincher own their own trucks, tractors, trailers, mules, saws, bits, and other attendant equipment necessary to operate the portable mills. They pay for the maintenance and operation of all of the equipment including the mills used at the job sites. Willing's investment at the time of trial for all of his equipment was $1500 to $2000 in its then depreciated and used condition; however, such equipment when bought new by him constituted an investment of approximately $10,000. The lumber company has occasionally provided the use of a bulldozer at various job sites, and when trucks owned by Willing or Fincher have not been in operating condition, the company has provided substitute trucks to get the rough lumber to the company yard. On these occasions the driver and other costs

of operation of the truck have been paid by Willing or Fincher. They have borrowed money from the lumber company to cover some of the maintenance and operating expenses of their equipment, and have occasionally obtained advances from the lumber company for other purposes. The company maintains records with respect to advances and loans and rental payments on the portable sawmills, and it regularly submits weekly statements reflecting deductions for such amounts from the payments due Willing and Fincher for cutting timber.

Neither Willing nor Fincher has ever sold lumber processed with the lumber company's mill to any one other than the Aiken Lumber Company; however, they have done various jobs for individuals with the use of the portable sawmills. During the period from 1962 to date the tax returns of Willing and Fincher have generally shown small net profits resulting from their operations, although the gross receipts have amounted to as much as $48,000 per year. Lawrence Fincher's tax returns, however, did reflect a net profit in 1964 of approximately $10,000; in 1963 a net profit of $3,200; and in 1962 a net profit of $5,268. Although the evidence in inconclusive as to the net earnings made by Willing and the Finchers on an average resulting from their sawmill operations, I find from the evidence and testimony presented that the business engaged in by these men is a substantial business operation, and that the potential earnings for a prudent and efficient business man are substantial, depending to a large degree upon individual ability and initiative, since the gross payments per thousand board feet paid by defendants to them are reasonable and fair, as evidenced by plaintiff's own witness, Harvey Holmes.

Willing and Fincher have maintained and kept all of the records of their employees, including payrolls, tax withholding statements, and social security payments for each employee. All Income Tax withholdings and social security payments have been made by them, and the lumber company has no supervision, control, knowledge or participation in such activities. Also the "Time Book" for each employee has been kept by Willing and Fincher. The lumber company has received and used payroll records from Willing and Fincher in computing quarterly premiums for workmen's compensation coverage carried over these employees by the company, which premiums are determined by the gross wages paid by Willing and Fincher to their employees. Under South Carolina Workmen's Compensation Law, employer is generally responsible for injuries to employees of his independent contractors. Thus, it was desirable that defendants have compensation coverage over Willing's and Fincher's employees, even though it was not mandatory under the Compensation Act.

During the trial testimony of Harvey Holmes, one of plaintiff's witnesses who is admittedly an independent contractor operating a portable sawmill, with a substantial portion of his timber being cut for the defendants, substantiated the fact that the operation of Willing and Fincher is essentially that of his operation in sawmilling tracts of timber which are bought from third parties and cut to order by Holmes. The testimony of this witness revealed that he had cut timber for defendants at approximately the same rates as that charged by Willing and Fincher; and that he has received advances from Aiken Lumber Company for as much as $10,000 while under contract to cut timber for the company. Holmes also testified that he would willingly contract to cut timber for Aiken Lumber Company under the arrangements negotiated by Willing and the Finchers; and that he would be able to make a substantial profit therefrom.

The above facts are generally agreed to by all parties concerned. The question before the court is whether Willing and the Finchers are independent contractors, or whether they and their workers are employees of the company within the intent and purpose of the Fair Labor Standards Act. The term "employee" is defined in Section 3(e) of the

Act to include any individual employed by an employer; and the term "employ" is defined in Section 3(g) to include, to suffer or permit to work; and the application of such statutory definitions is not to be confined to technical, traditional or common law concepts, or to be decided by the "contractual labels" which parties may attach to their relationship, but they must be given a practical construction to include workers in the light of the policy and purposes of each Act and according to the circumstances of an entire activity rather than isolated factors. United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 [1947]; Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 [1947].

In United States v. Silk, supra, the Supreme Court discussed the characteristics that should be considered in determining the employee-employer relationship as opposed to that of an independent contractor within the meaning and intent of the Social Security Act. Among the things to be considered, declared the Court, are the extent to which the services rendered by the workers are an integral part of the principal's business; the permanency of the relationship; the opportunities for profit and loss; the initiative, judgment and foresight exercised by the one who performs the services; and the amount and degree of control which a principal has in each particular situation.

However, the degree of control exercised by the principal is not the sole criterion to be applied. McComb v. Homeworkers' Handicraft Cooperative, 176 F.2d 633 [4th Cir. 1949].

In Rutherford Food Corporation v. McComb, supra, decided the same day as United States v. Silk, the Court applied the above principles to the Fair Labor Standards Act in determining whether a "boner" in a slaughterhouse operation was an employee or independent contractor. There the slaughterhouse operator entered into a written contract with a boner providing that the boner would employ other workers to assist him in the operation. The boner was to have complete control over his employees and bought his own tools, clothes, etc. He was provided a room by the slaughterhouse operator in the main plant for which he paid rent and in which the boning operations were completed. The Supreme Court held that the assistant boners, as well as the contractor-boner, were employees of the slaughterhouse operator within the meaning of the Fair Labor Standards Act, stating at 331 U.S. 730, 67 S.Ct. 1477:

> "We think, however, that the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity. Viewed in this way, the workers did a specialty job on the production line. The responsibility under the boning contracts without material changes passed from one boner to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept close touch on the operation. While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor. Upon the whole, we must conclude that these meat boners were employees of the slaughtering plant under the Fair Labor Standards Act."

In considering the operation of Willing and Fincher in the light of the tests enunciated by the Supreme Court in United States v. Silk, supra, and *Rutherford,* supra, I am constrained to conclude that Willing and Fincher are independent contractors and that they and their sawmill crews are not employees of defendants in the purview of the Act. The factual situation existing here is quite different and distinguishing from those in *Silk* and *Rutherford.* The

operations of the portable sawmills are not an integral part of the operation of the lumber company within the meaning of *Silk*. Willing and Fincher carry on separable, distinct, and independent businesses. Their activities have no permanent location and their entire operation is shifted regularly from place to place, many miles from defendants' plant. Their workers do not perform a specialty job on a production line. Also, Willing and Fincher are the sole judges as to whether they work personally or even go to their mills. In addition, the evidence in the case convincingly demonstrates that, depending upon the business acumen of the individual operator, there does exist an opportunity for substantial profit to be made out of the portable sawmill operation. Furthermore, their investment in trucks, mules, machinery, supplies, and other equipment necessary to carry on their portable sawmill operations is substantial. As was well stated in Tobin v. Cherry River Boom and Lumber Company, 102 F.Supp. 763 [D.C. W.Va. 1952], a case analogous to the matter before the court here:

"If all persons named in the first list were to be classified as employees for the purposes of the Act, then who could ever be a contractor in a timber operation? These men furnish their own equipment; employ their own workmen; construct their own facilities, often at large costs to themelves; are not required to work personally unless they see fit; and enjoyed the opportunity to make substantial profits from their operations if their work was efficiently and economically managed."

Furthermore, in United States v. Silk, the Supreme Court observed at 331 U.S. 714, 67 S.Ct. 1468:

"There is no indication that Congress intended to change normal business relationships through which one business organization obtained the services of another to perform a portion of production or distribution. Few businesses are so completely integrated that they can themselves produce the raw material, manufacture and distribute the finished product to the ultimate consumer without assistance from independent contractors."

## II. HAVE DEFENDANTS VIOLATED THE SHIPPING OR "HOT GOODS" PROVISIONS OF THE ACT?

Plaintiff contends that, even though Willing and Fincher and their crews are not employees of defendants, the latter have nevertheless violated Section 15(a) (1) of the Act by shipping lumber in interstate commerce with knowledge that such employees were employed at wages less than that prescribed by the Act. Section 15(a) (1) provides that it shall be unlawful for any person to ship or sell any goods in interstate commerce in the production of which *any employee* was employed in violation of the wage provisions of the Act. It is undisputed that some of the timber cut by Willing and Fincher is shipped in interstate commerce by defendant. The evidence herein shows that the employees at the portable sawmills in question regularly worked nine hours per day, five days a week, and were paid daily wages ranging from $7 to $10. Notwithstanding any minor violations in such hours and rates the average hourly earnings of some of these employees were consistently less than $1.15 per hour prior to September 3, 1963, and less than $1.25 per hour thereafter. These employees generally, and the drivers of the trucks in particular frequently worked more than forty hours per week receiving no extra overtime compensation for such extra hours.

The history of the Department of Labor's administrative procedures against the Aiken Lumber Company began as early as 1951 in connection with the relationship of the employees operating the portable sawmills in question. The company was investigated in 1956 and again in 1964 concerning this same question. During the 1964 investigation three of the four named defendants, as well as legal counsel, were advised by the Wage and Hour Investigator that the

lumber regularly shipped by the company was being produced by employees who were receiving less than the statutory minimum wages. In addition the company regularly obtained employee payroll records from Willing and Fincher which it used to compute premium payments for workmen's compensation coverage for these employees. I therefore find that the defendants had actual or constructive knowledge that the workers at the portable sawmill sites were being paid wages less than that required by the Act. Consequently they have violated Section 15 (a) (1) of the Act by shipping lumber in interstate commerce knowing the same to have been produced by workers who were paid less than the minimum wages prescribed by the Act although such workers were not employees of the company.[4]

However, it is apparent to the court that the company was never charged with a violation of the "shipping" provisions of the Act prior to the filing of plaintiff's complaint. All of plaintiff's investigations, reports and conferences with company officials concerned only the question of the employee status of the men operating the portable sawmills. Furthermore, at the pretrial conference held in Aiken on September 13, 1965, counsel for plaintiff and defendant stipulated that the sole issues in the case were whether Willing and Fincher and their crews were employees of the lumber company, and whether injunction should issue against defendants for alleged violations of the Act with respect to these workers, solely upon premise that they were employees of defendants. These stipulations were embodied in the Pretrial Order dated September 24, 1965.

At the commencement of the trial, plaintiff for the first time asserted the position that, regardless of the employee status of the crews and operators of the portable sawmill, defendants were nevertheless guilty of violating the shipping provisions of the Act.[5]

■ In fairness to defendants, the court is fully aware that they did not wilfully and knowingly continue to violate the shipping provisions of the Act throughout the long history of the Labor Department's intermittent investigations of their activities in callous disregard of any admonitions of the Department. It is readily apparent that until the first day of the trial of the case, defendants sincerely believed that they were not violating any provisions of the Act, unless the court determined that Willing and Fincher and their crews were employees of the lumber company. The question of the relation of these workers to the company is unquestionably a bona fide issue which does not lend itself to an easy or readily apparent answer. Clearly the dispute herein reflects no bad faith on the part of the defendants, nor an attempt to evade the purpose and intent of the Fair Labor Standards Act.

III. Having determined that the defendant lumber company has violated the shipping provisions of the Act, the final question for determination is whether the court should issue an injunction enjoining and restraining defendant from continued violations of the Act. The court is aware that every violation of the Act does not require the issuance of an injunction, inasmuch as an injunction is a drastic remedy which should not be invoked as a punitive measure, but only to insure future compliance with the Act.

4.  Southern Advance Bag & Paper Co. v. United States, 133 F.2d 449 [5th Cir. 1943]; Walling v. Acosta, 140 F.2d 892 [1st Cir. 1944]; Mitchell v. Hertzke, 234 F.2d 183 [10th Cir. 1956].

5.  When plaintiff asserted this position at the beginning of the trial, defendants evinced genuine surprise and counsel stated to the court they were not prepared to present a defense to these allegations. The court first ruled that no testimony or evidence would be permitted on the issue of the shipping violations. However, counsel for the parties subsequently agreed that plaintiff would present its entire case and defendant could at a later date, if desired, present testimony and evidence on this issue. Subsequently, defense counsel advised that no further proceedings were desired on this issue.

Walling v. Clinchfield Coal Corporation, 159 F.2d 395 [1946].

The record in subject case shows that defendants have been in violation of the Act for some time, although not wilfully or intentionally. Section 17 of the Act confers authority on district courts to restrain violations of the Act for cause shown and enforcement of the Act has been placed in the courts jointly with the administrative agency, the Wage and Hour Division of the Department of Labor, which cannot enforce the will of Congress alone.

Since the trial of the case, the court has been informed by counsel for defendants that Harmon Fincher and his crew no longer cut timber for the company; and that appropriate financial arrangements have been concluded so that all of Gedding Willing's workers are now being paid wages in accordance with the Act. The court is further informed that the company is now satisfied that Willing is keeping proper records in that he has consulted with Mr. Harvey Holmes and has set up his books and records according to Mr. Holmes' [6] methods who, it is understood by the court, has been adjudged to be in full compliance with the record-keeping provisions of the Act. The company avers, therefore, that this independent contractor is now in full compliance with the Act insofar as the company has knowledge of his operations, and that it shall not hereafter knowingly ship lumber in commerce in violation of Section 15(a) (1) of the Act.

▇ Consideration of the entire record in this case indicates that defendants have acted in good faith throughout all of the proceedings dating from 1951, and that a bona fide dispute has existed at all times with respect to the status of the workers at the portable sawmills under the Act. The record also convinces that defendants have not acted wilfully or maliciously so as to demand drastic actions to be applied against them.

The court is fully aware of its role in enforcing the will of Congress with respect to the Fair Labor Standards Act, but is equally cognizant of the fact that the purpose of exercising injunctive power under Section 17 is to insure compliance, not to punish. Issuance of an injunction relegates a citizen to a state of embarrassment and taints him with the stigma of unlawful conduct, as well as subjecting him to possible contempt proceedings. Such drastic measures should be applied only when required to insure compliance, and not under circumstances where citizens have acted in good faith in contesting the contentions of the government, and have voluntarily agreed to comply with lawful provisions of the Act as determined by the Court. As stated by the United States Supreme Court in Walling v. Youngerman-Reynolds Hardwood Company, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 [1945]:

> *"First.* The District Court found that even though the former piece rate agreements be considered unlawful the respondent had no apparent intention of resuming their use. It also found no willful intention on the part of the respondent to violate the Act and no evidence of any intention of future violations. It therefore felt that there was no necessity for an injunction. While 'voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power,' Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29, it may justify a court's refusal to enjoin future activity of this nature when it is combined with a bona fide intention to comply with the law and not to resume the wrongful acts. Cf. United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 297, 64 L.Ed. 343. We cannot say, therefore, that the District Court abused its discretion in refusing to enjoin the abandoned method of wage payments."

I find therefore in this case that all of the issues have been finally settled be-

---

6. Mr. Holmes is an independent contractor who operates portable sawmills and who was called as witness in this case by plaintiff.

tween plaintiff and defendants, that defendants are now in compliance with the provisions of the Act, have acted to insure that Gedding Willing is also in compliance, and being fully convinced that they will remain in compliance in the future, the necessity for issuance of an injunction does not exist. However, the court will retain jurisdiction of the case in the event there should be indications of renewed violations by these defendants in the future. It is, therefore,

Ordered that Willing and Fincher and their respective employees are not employees of defendants in the purview of the Act; it is further

Ordered that plaintiff's demand for an injunction enjoining and restraining defendants from committing violations of the Act be, and it hereby is, denied at this time; it is further

Ordered that jurisdiction of this cause be retained by the court in order that same may be reopened in the future for further proceedings upon a proper showing that defendants are in apparent violation of the Act. It is, further,

Ordered that each party pay its own costs.

Let judgment be entered accordingly.