RUTHERFORD FOOD CORP. ET AL. v. McCOMB, WAGE AND HOUR ADMINISTRATOR.

No. 562.    Argued April 9, 10, 1947.—Decided June 16, 1947.

*E. R. Morrison* argued the cause for petitioners. With him on the brief was *R. L. Hecker.*

*Bessie Margolin* argued the cause for respondent. With her on the brief were *Acting Solicitor General Washington, Philip Elman, William S. Tyson* and *Morton Liftin.*

MR. JUSTICE REED delivered the opinion of the Court.

The Administrator of the Wage and Hour Division of the Department of Labor brought this action to enjoin the Rutherford Food Corporation and the Kaiser Packing Company from further violating the Fair Labor Standards Act.[1] The Administrator alleged that the defendants had repeatedly failed to keep proper records and to pay certain of its employees overtime as required by § 7 of the Act.[2] The District Court refused to grant the injunction. The Circuit Court of Appeals reversed on appeal, and directed the entry of the judgment substantially as prayed for. *Walling* v. *Rutherford Food Corporation,* 156 F. 2d 513. We brought the case here because of the importance of the issues presented by the petition for certiorari to the administration of the Act.

The Fair Labor Standards Act of 1938, enacted June 25, 1938, is a part of the social legislation of the 1930's of the same general character as the National Labor Relations Act of July 5, 1935, 49 Stat. 449, and the Social Security Act of August 14, 1935, 49 Stat. 620. Decisions that define the coverage of the employer-employee relationship under the Labor and Social Security acts are persuasive in the consideration of a similar coverage under the Fair Labor Standards Act. See *Labor Board* v. *Hearst Pub-*

---

[1] 52 Stat. 1060.

[2] 29 U. S. C. § 207.

*lications,* 322 U. S. 111; *United States* v. *Silk, ante,* p. 704, decided today.

The petitioners are corporations of Missouri authorized to do business in Kansas. The slaughterhouse of the Kaiser Packing Company, the place of the alleged violations with which we are concerned, and the principal place of business of that company, is in Kansas City, Kansas, from which it ships meat in interstate commerce. Since 1942 most of its product has been boned beef. The petitioner, Rutherford Food Corporation, has its principal place of business and its plant for processing meat products in Kansas City, Missouri. In 1943, Rutherford bought 51% of the stock of Kaiser in order to assure itself of a constant supply of boned beef for contracts it had with the U. S. Army. Kaiser had been operating and continued to operate at a loss, and Rutherford advanced more than $50,000 to Kaiser between March, when Rutherford bought the Kaiser stock, and July, 1943. To assure itself of a continued supply of meat, Rutherford leased Kaiser's facilities and took over operation of the slaughterhouse in July. In May, 1944, the lease was terminated and Rutherford's stock interest in Kaiser sold, so that Kaiser might qualify for subsidies granted by the Defense Supplies Corporation to unaffiliated nonprocessing slaughterers under its Regulation No. 3.[3]

Prior to 1942 Kaiser had one hourly paid employee who acted as a combined butcher, beef boner and order filler. During 1942, in order to be able to furnish beef boned to Army specifications to the Army under contract, Kaiser entered into a written contract with one Reed, an experienced boner, which provided that Reed should assemble a group of skilled boners to do the boning at the slaughterhouse. The terms of the contract were that Reed should be paid for the work of boning an amount per hundred-

---

[3] 8 F. R. 10826; 8 F. R. 14641; 9 F. R. 1820.

weight of boned beef, that he would have complete control over the other boners, who would be his employees, that Kaiser would furnish a room in its plant for the work, known as the boning vestibule, into which the carcasses of cattle slaughtered by Kaiser would be moved on overhead rails by Kaiser employees, that Kaiser would also furnish barrels for the boned meat which would be washed and moved out of the vestibule by Kaiser's employees. Reed abandoned the work in February, 1943, and the work was taken over under an oral contract by one of the boners who had worked with him. This boner, Schindel, also abandoned the work in May, 1944, and an oral contract was then made by the company with Hooper and Deere, who had worked with Schindel. After a few months Deere left, at which time Hooper entered into a written contract substantially like the one between Kaiser and Reed, save that it provided for rent to be paid by Hooper for the boning room, although as a matter of fact no rent was ever paid. The District Court found that since the boning work had started in 1942, the money paid by Kaiser had been shared equally among all the boners, except for a short time after Hooper took over the work when he paid some of the boners by the hour. It was stipulated further that the boners owned their own tools, although these consisted merely of a hook to hold the meat, a knife to cut it, a sharpener for the knife, and a leather belt (apron). Although the C. I. O. union which was the representative of the workers of the company insisted that the boners be members, and although the written contracts provided that they should join, it was stipulated that the union dues of the boners were not checked off and that the boners were not subject to the authority of the union steward at the plant.

The slaughterhouse operations, of which the boning is a part, are carried on in a series of interdependent steps.

The cattle are slaughtered, skinned and dressed in the killing room, and the carcasses are moved thence on overhead rails into an overnight cooler by employees of Kaiser. The next day they are moved into another cooler and then into the boning vestibule, on the same overhead rail. They move around the boning room on the rail, each boner cutting off a section for boning. The boneless meat is put into barrels, or passed to a trimmer, an employee of Kaiser, who trims waste matter from the boned meat. Waste is put into other barrels. The barrels are moved from the boning room by employees of Kaiser into another room, called the dock, where the meat is weighed and put on trucks. Kaiser has never attempted to control the hours of the boners, but they must "keep the work current and the hours they work depend in large measure upon the number of cattle slaughtered." 156 F. 2d 513, 515. It is undisputed that the president and manager of Kaiser goes through the boning vestibule many times a day and "is after the boners frequently about their failure to cut all of the meat off the bones."

The Administrator thought these facts brought the boners within the classification of employees, as that term is used in the Act. But the District Court thought that they were independent contractors, and denied the injunction sought by the Administrator. The Circuit Court of Appeals, however, said: "The operations at the slaughterhouse constitute an integrated economic unit devoted primarily to the production of boneless beef. Practically all of the work entering into the unit is done at one place and under one roof. . . . The boners work alongside admitted employees of the plant operator at their tasks. The task of each is performed in its natural order as a contribution to the accomplishment of a common objective." In its view the test for determining who was an employee under the Act was not the common law test of

control, "as the Act concerns itself with the correction of economic evils through remedies which were unknown at common law . . . ." It concluded that the "underlying economic realities . . . lead to the conclusion that the boners were and are employees of Kaiser . . . ." 156 F. 2d 513, 516–17.

The Fair Labor Standards Act was passed by Congress to lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions. An effort to eliminate low wages and long hours was the method chosen to free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers. It was sought to accomplish this purpose by the minimum pay and maximum hour provisions and the requirement that records of employees' services be kept by the employer.[4] To make the method effective, the Act contains a section granting to the district courts of the United States jurisdiction to enjoin certain violations of the Act here involved, relating to the keeping of records of employment and the paying of overtime.[5] Whether or not the acts charged in this complaint violate the Act depends, so far as the meat boners are concerned, upon a determination as to whether either or both respondents are employers of the boners. As our conclusion requires further action in the trial court to frame the injunction, we shall treat only the question of the relationship of the boners to the alleged employers. We shall not in our consideration undertake to reach any conclusion as to the appropriate form of an injunction. We pass only upon the question whether the boners were

[4] 52 Stat. 1060, §§ 2, 6, 7, 11 (c). *United States* v. *Darby,* 312 U. S. 100, 125; *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 577–78.

[5] 52 Stat. 1060, §§ 17, 15, 7 (a), 11 (c).

employees of the operator of the Kansas plant under the Fair Labor Standards Act.

As in the National Labor Relations Act and the Social Security Act, there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the employer-employee relationship under the Act. Provisions which have some bearing appear in the margin.[6] The definition of "employ" is broad. It evidently derives from the child labor statutes and it should be noted that this definition applies to the child labor provisions of this Act, § 12.[7] We have decided that it is not so broad as to include those "who, without any express or implied

---

[6] 52 Stat. 1060, § 3:

"As used in this Act—

.      .      .      .      .

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .

"(e) 'Employee' includes any individual employed by an employer.

.      .      .      .      .

"(g) 'Employ' includes to suffer or permit to work."

[7] Note 11 in the brief for the United States summarizes the relevant data:

"At the time of the enactment of the Fair Labor Standards Act, the phrase 'employed, permitted or suffered to work' was contained in the child labor statutes of thirty-two States and the District of Columbia. The same phraseology appeared in the Uniform Child Labor Laws recommended in 1911 and in 1930 by the National Conference of Commissioners on Uniform State Laws (Child Labor Bulletin, Vol. I, No. 2, August 1912; Proceedings of the National Conference, 1930), in the Standard Child Labor Law recommended in the Child Labor Legislation Handbook compiled by Josephine C. Goldmark (See e. g., issue of 1904, p. 11), and in the Standards Recommended for Child Labor Legislation by the International Association of Governmental Labor Officials. The phrase 'employed or permitted to work' was found in seventeen State statutes as well as in the Federal statutes held unconstitutional in *Hammer* v. *Dagenhart*, 247 U. S. 251, and *Child Labor Tax Case*, 259 U. S. 20. The statutes are cited in the Appendix to this brief, *infra*, pp. 58–60."

compensation agreement, might work for their own advantage on the premises of another." *Walling* v. *Portland Terminal Co.,* 330 U. S. 148, 152, decided February 17, 1947. In the same opinion, however, we pointed out that "This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships which, prior to this Act, were not deemed to fall within an employer-employee category." 330 U. S. 148, 150. We have said that the Act included those who are compensated on a piece rate basis. *United States* v. *Rosenwasser,* 323 U. S. 360. We have accepted a stipulation that station "redcaps" were railroad employees. *Williams* v. *Jacksonville Terminal Co.,* 315 U. S. 386, 391. There may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees. See *United States* v. *Silk, supra;* compare *Roland Electrical Co.* v. *Walling,* 326 U. S. 657; *Martino* v. *Michigan Window Cleaning Co.,* 327 U. S. 173. We conclude, however, that these meat boners are not independent contractors. We agree with the Circuit Court of Appeals, quoted above, in its characterization of their work as a part of the integrated unit of production under such circumstances that the workers performing the task were employees of the establishment. Where the work done, in its essence, follows the usual path of an employee, putting on an "independent contractor" label does not take the worker from the protection of the Act.[8]

The District Court was of the view that:

"The right to contract is not only an inherent right but a constitutional right, and independent contracts, as a method of quantity production of

---

[8] See *Walling* v. *American Needlecrafts,* 139 F. 2d 60; *United States* v. *Vogue, Inc.,* 145 F. 2d 609; *Walling* v. *Twyeffort, Inc.,* 158 F. 2d 944.

boned beef, have not been uncommon in the packing business, generally. . . . The plan under which boners share equally in the boning money is commonly employed in Kansas City and elsewhere, and most of the boners who have worked in the Kaiser plant have worked at various times and in various plants under independent contractors. There is nothing inequitable in the sharing method under which compensation is divided equally among the group. It gives each man an interest in the amount of work being done by the other members of the group. It also gives no advantage to the man who is boning the fleshier parts of the carcass. Under this plan beginners and casual boners can be equitably taken care of by payment on an hourly basis out of the boning money."

We think, however, that the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity. Viewed in this way, the workers did a specialty job on the production line. The responsibility under the boning contracts without material changes passed from one boner to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept close touch on the operation. While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor. Upon the whole, we must conclude that these meat boners were employees of the slaughtering plant under the Fair Labor Standards Act.

We therefore affirm the conclusion to that effect of the Circuit Court of Appeals and modify the direction of the judgment of that court "for the entry of a judgment substantially as prayed," so as to leave the District Court free to frame its decree in accordance with this decision.

*It is so ordered.*