UNITED STATES of America, Plaintiff,

v.

NEW ENGLAND COAL AND COKE COMPANY, A Corporation, Defendant.

Civ. A. No. 60–325–S.

United States District Court
D. Massachusetts.
Sept. 20, 1962.

W. Arthur Garrity, Jr., U. S. Atty., John J. Curtin, Jr., Asst. U. S. Atty., Boston, Mass., for plaintiff.

James S. Eastham, Francis J. Vaas, Ropes & Gray, Boston, Mass., for defendant.

SWEENEY, Chief Justice.

This action was brought under Section 2 of the Walsh-Healey Public Contracts Act, 41 U.S.C. § 36, to recover sums of money claimed to be due to the United States by reason of alleged violations of certain representations and stipulations contained in contracts between the plaintiff and defendant for the supply of coal.

When the complaint was filed, there were still pending administrative proceedings, contemplated by the Act, for the purpose of determining whether the defendant herein had violated its obligations. This case was stayed until the completion, in September 1961, of the administrative proceedings which resulted in decisions adverse to the defendant. A copy of the administrative record and several stipulations between these parties have been filed in the instant case, and both sides have now moved for summary judgment.

The Walsh-Healey Act provides that government contracts for the manufacture or furnishing of materials or goods in an amount exceeding $10,000 shall include certain representations and stipulations including:

(a) "That the contractor is the manufacturer of or regular dealer in the materials * * * to be * * * used in the performance of the contract;

(b) "That all persons employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid * * * not less than the minimum wage as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work * * *." and

(c) That they will receive at least one and one-half times their basic rate of pay for hours worked in excess of 8 hours per day or 40 per week. 41 U.S.C. § 35.

The defendant, a regular dealer in coal, in the normal course of its business, bid upon and was awarded four contracts with the United States to supply coal to government installations. The contracts contained the required representations and stipulations and a provision that the coal was to be secured by the defendant from "Mary Frances # 7" mine.

The coal delivered to the United States came from the defendant's stockpiles of Beacon Stoker coal, which it, as a dealer, maintained at its Everett, Charlestown, and Mystic Docks in Boston Harbor. The Beacon Stoker coal in these piles was concededly of the grade and quality required by the contracts, although the evidence did not establish that all of it had been mined at Mary Frances No. 7 mine. In fact, the major portion of the coal delivered to the United States had come from other sources. During the period January 1, 1957 to June 30, 1959, when these contracts were in effect, only 6.86% of the coal in the stockpiles had been purchased from Mary Frances and the remaining 93.14% from other producing mines. The coal from all sources was intermingled. During this same pe-

riod, of the total tonnage delivered from these stockpiles to the defendant's customers, 11.64% went to the government.

Mary Frances obtained coal from three sources: 1) from its own deep mining operations conducted by its own employees, 2) from so-called "contractors" who mined coal on part of the mining properties comprising what is known as "Mary Frances # 7" mine, and 3) from other suppliers who mined coal on other properties in the vicinity. Mary Frances gathered, cleaned and graded the coal from all these sources at its tipple at Willis Branch, West Virginia, from which it was shipped by railroad and coastwise colliers to the defendant's stockpiles.

The basis of the government's complaint is that certain employees of the contractors and suppliers who delivered coal to Mary Frances were paid at rates allegedly less than Walsh-Healey minimums, that they did not receive overtime pay and that their working conditions were unsafe.

In the administrative proceedings the government contended that Mary Frances Coal Company and its president, as well as the defendant, were liable for these alleged violations. But the hearing examiner held the defendant, alone, liable. The Wage and Hour and Public Contracts Administrator affirmed the decision against the defendant while expressing no opinion with respect to Mary Frances on the ground that that portion of the hearing examiner's decision had not been appealed.

The parties have stipulated that if this Court finds the defendant liable, the amount of damages is $64,089.52.

The statute provides that the administrative findings of fact shall be conclusive if supported by the preponderance of the evidence, 41 U.S.C. § 39, and the defendant's denial that the employees of the suppliers to Mary Frances are "employed by" the defendant within

the meaning of Section 35(b) presents the question of this case.

While the term "employed" is nowhere in the statute defined, such words as "employ," "employee," "employer" have, on numerous occasions, been interpreted in the context of similar social legislation. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). These words have consistently been held to import meanings broader than the technical common law definitions—their scope is to be determined in the light of the statutory scheme and purpose and the underlying economic facts.

As noted above, Section 35(a) of the Act requires the inclusion (in every contract over $10,000) of a stipulation "That the contractor is the manufacturer of or a regular dealer in the materials * * * to be manufactured or used in the performance of the contract." The legislative history indicates that the terms "manufacturer" and "regular dealer" were used to eliminate the problem and practice of bid brokerage and bid peddling [1] by permitting only legitimate and well-established concerns to compete for government business. H.R. No. 2946, 75th Cong. 2d Sess. (1936). The Regulations under the Act implement this aim by defining a regular dealer as " * * * a person who owns, operates, or maintains a store, warehouse, or other establishment in which the materials, supplies, articles, or equipment of the general character described by the specifications and required under the contract are brought, kept in stock, and sold to the public in the usual course of business." Walsh-Healey Regulations § 50–201.101. A contractor, therefore, to qualify as a regular dealer and be eligible to bid on government contracts, must

---

1. Persons who were not legitimate dealers submitted estimates so low that no reputable, established concerns could

compete and, when awarded a contract, sublet various portions to substandard factories and producers.

maintain a stockpile. And by being required to stockpile, a regular dealer cannot become a mere middleman or bid broker.

It is by means of the stockpile requirement that the Congress and the Secretary of Labor sought to prevent evasion by contractors, not bidding as manufacturers, of the labor standards provided in the Act; and in the light of this arrangement there cannot have been any intention to make regular dealers also guarantors of the labor standards of their suppliers.

This interpretation is borne out by Rulings and Interpretations No. 3 of the Administrator. Section 32 provides that a contractor "assumes an obligation to manufacture or furnish the commodities required under the labor standards of the Act. He may not relieve himself of this obligation merely by shifting the work to another." If he does attempt to avoid the Act, he is liable jointly with the person to whom the work was shifted for any non-compliance by that person. Sections 30, 31, 33 and 34 of these Rulings define the situations which are viewed as evasions. Only Section 34 concerns regular dealers and provides that whenever a dealer "causes a manufacturer to deliver directly to the Government, the materials * * * required under the contract, such dealer will be deemed the agent of the manufacturer in executing the contract." Since, in such a case, a dealer in effect avoids the stockpile requirement, he does not act as a regular dealer but shifts the work of supplying the government to another;

and thereby he becomes liable for the labor standards of the manufacturer-supplier. There is nothing in the statute, regulations, or rules, however, which provides for liability for the labor standards of suppliers of a regular dealer who furnishes the specified commodities from his stockpile.

But the government argues that the purpose of the Walsh-Healey Act is to use the government's immense purchasing power to raise labor standards and "if it is permissible to furnish goods from sources paying substandard wages, then the advantage will be with such sources, and the competitive pressure will be on all sources to join them." Government's brief, p. 6. Even more explicit is a dictum of the Administrator in In re Golden State Co., 10 WH Cases 153, at 156 (1951): " * * * the language 'no person employed by the contractor * * *' can only mean 'no person employed at the instance of the contractor' if the statutory purpose is to be preserved." This is patently absurd. Is a regular dealer in machine tools, for example, to be liable for the labor standards of the manufacturer of the tools, of the producer of the steel from which the tools are made, of the producers of coal that is used in making the steel? At which point in this chain does the contractor's liability cease?

Moreover, the "long line of administrative decisions * * * explicitly holding regular dealers liable for non-compliance by their sources"[2] (Government's brief, p. 11) is not in point. In none of them did the contractor fill the

---

2. In re Negri, 9 WH Cases 578 (decision of Secretary, Sept. 13, 1950); In re Golden State Co., 9 WH Cases 164, 174 (decision of Hearing Examiner, Aug. 1, 1949), affirmed 10 WH Cases 153 (decision of Administrator, Feb. 16, 1951); In re Coal Creek Co., 11 WH Cases 299 (decision of Hearing Examiner, Dec. 31, 1952), affirmed 11 WH Cases 563 (decision of Administrator, July 31, 1953); In re Midland Coal Corp., 12 WH Cases 151 (decision of Hearing Examiner, April 13, 1954), affirmed 13 WH Cases 909 (decision of Secretary of Labor, April 26, 1955); In re Southern

Illinois Cooperative, 13 WH Cases 558 and 13 WH Cases 556 (decisions of Hearing Examiner, Jan. 6, 1958, and Jan. 8, 1958); In re Summers, 14 WH Cases 546 (decision of Hearing Examiner, Dec. 9, 1959), affirmed 14 WH Cases 682 (decision of Administrator, May 25, 1960); In re Cardinal Fuel & Supply Co., 15 WH Cases 120 (decision of Hearing Examiner, May 26, 1961), affirmed 15 WH Cases 254 (decision of Administrator, Sept. 20, 1961); In re Maryland Coal & Coke Co., 15 WH Cases 90 (decision of Hearing Examiner, Feb. 10, 1961).

contract requirements from his stockpile. In all of them there was a direct shipment, as defined in Regulations § 50–201.-104 and Rulings § 34, from manufacturer or producer.

 I, therefore, rule that this defendant on these facts is liable only for the labor standards of persons actually employed by it and that the Administrator erred in holding the defendant liable for the failure of Mary Frances' suppliers to live up to the standards set by the Secretary. The defendant's motion for summary judgment is granted, the plaintiff's is denied.