W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Appellant,

v.

LONE STAR STEEL COMPANY,
Appellee.

No. 25462.

United States Court of Appeals
Fifth Circuit.

Dec. 12, 1968.

Bessie Margolin, Assoc. Sol., Robert E. Nagle, Atty., Dept. of Labor, Charles Donahue, Sol. of Labor, Donald S. Shire, Atty., Dept. of Labor, Washington, D. C., Major J. Parmenter, Regional Atty., for appellant.

Robert E. Burns, Burford, Ryburn & Ford, Dallas, Tex., Albert Tarbutton, Jr., Lone Star, Tex., for appellee.

Before RIVES and DYER, Circuit Judges, and MEHRTENS, District Judge.

MEHRTENS, District Judge:

W. Willard Wirtz, Secretary of Labor, appeals from a judgment in favor of Lone Star Steel Company and taxing costs against him. Three questions are presented on this appeal: (1) Is Lone Star an employer of individuals who work for contract haulers within the meaning of the Fair Labor Standards Act?; (2) Is Lone Star violating the "hot cargo" provisions of Section 15(a) (1) of the Act?; and (3) Was assessment of costs against the Secretary proper? The District Judge answered "No" to the first two questions and "Yes" to the third question. We affirm as to the first question and reverse as to the second and third questions.

*Employer-Employee Relationship*

Whether a person or corporation is an employer or joint employer is essentially a question of fact. Boire v. Greyhound Corporation, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849. Each case must be considered in light of the total situation or whole activity to determine whether an employer-employee relationship exists. The label "independent contractor" will not take the worker from the Act's protection if the work done in its essence follows the usual path of an employee. Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772. In considering whether a person or corporation is an "employer" or "joint employer", the total employment situation should be considered with particular regard to the following questions: (1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of the em-

ployees?; (4) Do the employees perform a "specialty job" within the production line?; and (5) May the employee refuse to work for the company or work for others?

The trial court in a detailed opinion found that Lone Star Steel Company was and is not an employer of the employees who work for the contractors and has not violated the provisions of Section 15(a) (2) or 15(a) (5) of the Act. The trial court's findings are attached hereto as an appendix. Being a question of fact, the Secretary would have to demonstrate that the findings below were clearly erroneous. Rule 52(a), F.R.Civ.P. We are unable to say that these findings are clearly erroneous. To the contrary, we conclude that the trial court's findings of fact on this question are amply supported by the evidence.

### Violation of "Hot Goods" Section

The trial court concluded that Lone Star Steel Company had not violated the provisions of Section 15(a) (1) of the Act upon the above findings and additional findings that the contract between the company and the contractors provided for the contractors' compliance with the relevant portions of the Act and written certification of compliance, and that the company made payments to the contractors in good faith relying upon these written assurances. While it is true that such written assurances were given, the record shows that in 1956 the United States Department of Labor conducted an investigation of the wages paid to the contractors' employees and thereafter filed actions alleging Wage and Hour violations by the contractors but not by the company. Lone Star Steel Company was notified of the investigation and was aware of the filing of such actions.

The person who had sole responsibility for keeping Lone Star Steel Company in compliance with the Act also had hearsay evidence that the "hot goods" section was being violated. This same person had been present when certain contractors of Lone Star had been tried and found to be in violation of the Act. Further, a foreman of Lone Star Steel Company also had hearsay evidence that the contract haulers were being paid by the load. "Good faith" under the Act does not include ignoring the obvious. Lone Star Steel Company had the contractual right to inspect the records of the contractors at any time. A good faith effort to comply with the Act would have included checking their records and any further investigation necessary to ascertain the facts. A person or a corporation cannot take an "ostrich-like attitude" and still be in good faith under the Fair Labor Standards Act. Mitchell v. Hausman, 5 Cir. 1958, 261 F.2d 778. Since the contractors violated the minimum wage provisions of the Act and Lone Star Steel Company could and should have known of such violation, Lone Star Steel Company is in violation of the "hot goods" section of the Act. We, therefore, reverse the lower court on this question without deciding the propriety of injunctive relief. We note in passing that the contractor had been in compliance with the Act for almost eighteen months prior to trial and so far as we are aware has continued to pay the drivers as required by law. On the record before us there is nothing to indicate that the contractors will not abide by the provisions of the Act in the future. Injunctive relief is not to punish for past violations, but to prevent future violations. Buckley v. Wirtz, 10 Cir. 1964, 326 F.2d 838. If it appears that an employer intends to comply in the future, the trial court may properly exercise its discretion in favor of denying an injunction. Cf. United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

### Assessment of Costs

In assessing costs against the Secretary, the lower court acted in accordance with the law as it now exists. Prior to the amendment of the Judicial Code on July 18, 1966, however, costs could not be awarded against the United

**671**

States except in rare cases. The amendment put private litigants on equal footing with the United States by permitting the assessment of costs against the United States. 28 U.S.C. § 2412, Pub.L. 89–507. Section 3 of Pub. L. 89–507 provides that the amendment shall only apply to judgments entered in actions filed subsequent to July 18, 1966. The amended complaint, adding additional defendants, was filed February 16, 1966, before the amendment to the costs provision was effective. The district court, therefore, committed error by assessing costs against the Secretary of Labor.

Affirmed in part, reversed in part, and remanded for further proceedings consistent herewith.

## APPENDIX

" * * * Lone Star Steel Company owns and operates a steel mill at Lone Star, Morris County, Texas, within the jurisdiction of the Court. At all times material hereto said defendant was engaged at its mill in the production of cast iron and steel products, which are regularly sold, shipped and delivered in interstate commerce. The Company also owns and operates various open-pit iron ore mines from which it mines and produces iron ore to be processed and used by its steel mill in producing such iron and steel products. The Company operates four 'short haul' mines which are located at distances ranging from 1.4 miles to 2.8 miles from the Company's ore plant where the iron ore is dumped. It operates one 'long haul' mine which is 7.8 miles from the ore plant, and one 'extra long haul' which is 11.1 miles from the ore plant.

"Lone Star Steel Company maintains and operates draglines at its mines which are operated by its own employees in loading ore trucks. The Company owns and operates certain ore trucks which are called 'Euclids' and which are operated by Company employees. The Euclid trucks are one-unit type dump trucks, designed for pulling heavy loads over rough roads and steep grades on short hauls and at low speeds. They are not designed for highway use. Customarily the Euclid trucks have been used by the Company in hauling ore from the short haul mines to the ore plant, although on one or two occasions they were tried out on the long haul for experimental purposes. The Company has been using the Euclid trucks in the above described manner from 1947 to the present time. The Company does not own or use any cab-and-trailer trucks of the type described below.

"In 1947 the Company entered into a contract with a third person to haul its iron ore from a mine located about 8 miles from the ore plant. From 1947 to the present time the Company has made similar contracts with other persons from time to time. Since 1957 the basic provisions of these contracts are these: (a) the iron ore Contractor will provide and operate at his own expense a specified number of trucks (at a cost to him of $15,000 to $25,000 each) to be used in hauling ore; (b) the Contractor will be paid by the Company a specified amount of money per gross ton for the iron ore which his trucks carry, the amount varying according to the particular mine which is involved; (c) the iron ore will be weighed by the Company and the Company will pay the Contractor two times per month; (d) the Contractor will furnish at his own expense public liability insurance and furnish certificates of such insurance to the Company; (e) the Contractor will pay all federal, state and local taxes upon his property or operations, including federal transportation taxes; (f) the Contractor will comply with the applicable requirements of the Fair Labor Standards Act of 1938, as amended; (g) the Contractor will keep full, complete and accurate records as to the wages and hours of his employees in compliance with the Act; (h) the Contractor is an independent contractor, and the Company shall exercise no control over the details of the Contractor's performance of the work; and (i) all drivers employed by the Contractor are employees of the Contractor and not the Company.

"Since 1947 the various iron ore contractors have operated under the terms of contracts of this type in hauling the Company's ore. They have exclusively used over-the-road cab-and-trailer type trucks, rather than single-unit Euclid trucks, their trucks being designed for higher speeds and longer hauls. During the three year period prior to the trial of this case, the Contractors' trucks were used almost exclusively in hauling ore from the 'long haul' and 'extra long haul' mines, and during that period of time they were used on the 'short haul' mines slightly over 2% of the time.

"In transporting the iron ore from the mines to the ore plant, the trucks operate over private roads which are owned by the Company. The Company exercises control over these roads and requires the Contractors and their drivers to obey safety rules regarding such factors as maximum speed, passing and stopping at full stops. These same safety regulations apply equally to other persons who use the roads.

"The Company does not hire or fire the drivers employed by the Contractors nor make recommendations in that regard. The Contractors buy their own trucks, repair and maintain their own trucks, pay all cost of operation of their trucks, and hire their own drivers and mechanics, and the Company takes no part in these activities. The Contractors respectively own from two to eight or nine trucks and hire an equivalent number of drivers. No painted sign or reference to 'Lone Star Steel Company' appears on their trucks. The Contractors keep the records on the hours worked by their drivers and mechanics, make the usual withholding for governmental purposes, and pay such employees, and the Company takes no part in these activities. In most instances the Company does not even know the identity of the drivers. The Contractors purchase their own liability and property insurance on their trucks. The Contractors are responsible for damage which their drivers or trucks may cause to the property of the Company or third persons, and contrariwise, if the Company or its employees damage property of a Contractor, the Company pays for the same.

"The Company does not have any rules or regulations which apply to the drivers of the Contractors' trucks other than the safety rules referred to above. The Contractors make their own decision as to who they will hire. The Company does not discipline the Contractors' drivers.

"The Company pays compensation on a per-ton basis to the Contractors only for iron ore delivered by them to the ore plant. If a Contractor's truck breaks down, he is paid nothing for his waiting time, breakdown time, or any other circumstance.

"The drivers of the Contractors do no work in or around the Company's premises other than to drive the trucks of the Contractors. They pick up the iron ore on a 'first come, first served' basis with no direction from the Company. On occasion one of the Company's draglines will break down, and Company's representatives will inform the Contractors and/or their drivers that they can either go to another mine to pick up ore, wait for repairs, or go off the job, depending upon the expected length of the breakdown.

"The Contractors are the owners and operators of small-to-medium trucking businesses. They must exercise sound business judgment and initiative to survive in a business with a relatively high risk factor. If one of their trucks is wrecked, they bear the loss. If the Company curtails its iron ore production, their profits are sharply reduced or may disappear entirely; or if production is increased, their opportunity for profit is increased.

"The Company also has similar contracts with three Contractors to furnish water trucks and drivers for watering the mine roads. These Contractors furnish seven trucks and drivers, and what has previously been said as to the iron ore Contractors applies equally as well

to the water Contractors, and will not be repeated. Suffice to say that the water Contractors furnish their own trucks, hire and pay their own drivers and furnish their own sources of water as well as their water pumps. The water Contractors are paid by the Company a fixed sum for each hour their trucks are in operation, and for example, if it should rain the roads do not need watering, the water trucks will not be used, and their owners receive no pay for the time the trucks are idle."