Juan Isidro **ITZEP**, et al., Plaintiff,

v.

**TARGET CORPORATION**
**et al., Defendants.**

**Civil Action No. SA–06–CA–568–XR.**

United States District Court,
W.D. Texas,
San Antonio Division.

Feb. 14, 2008.

B. Craig Deats, Deats, Durst, Owen & Levy, P.L.L.C., Victoria I. Gavito, William H. Beardall, Austin, TX, Joseph Pacifico Berra, Law Office of Joseph P. Berra, San Antonio, TX, for Plaintiff.

David Turner Wiley, Shannon Leigh Miller, Thomas A. Davis, Jackson Lewis LLP, Birmingham, AL, William L. Davis, Jackson Lewis LLP, Dallas, TX, Richard A. Pizzo Richard A. Pizzo, P.C. Tulsa, OK, for Defendants.

## ORDER

XAVIER RODRIGUEZ, District Judge.

On this date, the Court considered various pending motions.

Plaintiffs allege that they have performed cleaning and maintenance work at Target stores located in San Antonio and Austin, Texas. They allege that they have been wrongfully denied overtime pay. They also allege that during many workweeks they were paid below the FLSA mandated minimum wages. They seek unpaid minimum wages, overtime compensation, liquidated damages, attorney's fees and costs under 29 U.S.C. §§ 206, et. seq.

Plaintiffs allege that Target and Jim's Maintenance (hereinafter Jim's) were joint employers.

Target has filed a cross claim against Jim's and its principal, James Funderburgh. Target alleges that in 2003 and 2005, it entered into various agreements for cleaning services with Jim's, that both agreements specified that Jim's was the exclusive employer of any persons supplied to clean its stores, that the agreements required Jim's to comply with all employment laws, including the FLSA, that the agreements did not allow Jim's to subcontract any of the work to be performed, and that Jim's breached their agreements. Specifically, Target alleges that Jim's improperly classified the Plaintiffs as independent contractors, rather than employees. Target also alleges that rather than paying the Plaintiffs at least minimum wage and any statutorily required overtime, Jim's paid the Plaintiffs "by the shift."

Target seeks summary judgment regarding Plaintiffs' FLSA claims, arguing it was not a joint employer. In the alternative, Target argues that two of the Plaintiffs (Elvia Riojas and Baudel Vasquez) were exempt employees.

Target seeks summary judgment against Jim's, arguing that as a matter of law and contract, it is entitled to indemnification. Further, Target argues that, as a matter of law, Jim's breached its contractual obligations.

Plaintiffs seek a partial summary judgment requesting that this Court find that they were jointly employed by Target and Jim's.

## Summary Judgment Evidence

On January 13, January 29, and October 15, 2001, Target and Jim's entered into agreements wherein Jim's was to provide cleaning services at various Target stores. The agreements purported to create an independent contractor relationship. The agreements were not negotiated, but merely presented to Jim's on a take it or leave it basis.[1] Target developed the pricing method it would pay its cleaning contractors, including Jim's.[2] Target awarded contracts based on districts. If Target opened a new store within a new district, no new compensation was awarded to Jim's.[3] After 2001, Target constituted virtually all of Jim's business.[4] In 2005, Target unilaterally cut cleaning contractor compensation by 2 percent.[5] The Target relationship was not exclusive. Jim's could contractually bid on other business.[6] However, Jim's debt load prevented it from taking non-Target business.[7] Work-

1. Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 40, 57.

2. Deposition of Ted Fisher October 29, 2007 at pp. 275–288.

3. Deposition of James A. Funderburgh taken on August 28, 2007 at p. 45.

4. Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 41–42.

5. Deposition of James A. Funderburgh taken on August 28, 2007 at p. 46.

6. Deposition of James A. Funderburgh taken on August 28, 2007 at p. 43.

7. Deposition of James A. Funderburgh taken on August 28, 2007 at p. 43.

ers were "shared." That is, workers who used to work for a previous Target contractor were thereafter hired by Jim's.[8]

Jim's agreed to perform cleaning services in accordance with Target's specifications. Pursuant to the agreements, Jim's allegedly retained sole and exclusive control over the method and manner in which services were to be performed. The October agreement also contained provisions wherein Target, at its option, would provide cleaning supplies. Under this approach, Target assigned each contractor a specific monetary amount for cleaning chemicals, the contractor would order the chemicals through a specific ordering process, the supplies would be shipped to a specific Target store, and the chemicals would be paid for by Target.[9] Target provided many of the supplies used at the stores.[10] If Jim's did not fully use the cleaning allocation assigned, any unused monies reverted to Target.[11]

Attached to the agreements were numerous pages of daily, weekly, quarterly, and annual expectations and detailed specifications regarding the cleaning of stores. Target was highly concerned with keeping its "Brand" appearance. Part of the Target "brand" included keeping clean and attractive stores. Target conducted training seminars for its cleaning contractors.[12] At these training sessions, Target instructed their contractors on the best methods to clean and directed which chemicals could be used.[13] Target has promulgated numerous policies and manuals on how to clean floors, bathrooms, and windows. Many of these documents have been translated into Spanish for use by workers. During the holidays, Target issued special cleaning bulletins.[14] Jim's was not able to deviate from any practices specified in Target's contractor's handbook, even if it thought that another practice might be more effective.[15] The terms of the contractor's handbook were not negotiated between the parties, but rather were unilaterally imposed by Target.[16] Jim's was not provided a handbook until months after it entered into its agreement with Target.[17] Target directed the type of equipment that could be used by Jim's.[18]

Target employees directed the work of employees on occasions.[19] Other workers testified somewhat differently stating that, although they were not directed on what jobs to perform, Target managers directed the Jim's team leaders. In turn, the Jim's team leaders relayed the directives.[20]

---

**8.** Deposition of James A. Funderburgh taken on August 28, 2007 at p. 59.

**9.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 177.

**10.** Deposition of Ted Fisher taken on October 2, 2007 at pp. 178–182.

**11.** Deposition of Ted Fisher taken on October 2, 2007 at p. 178.

**12.** Deposition of Trent Smith taken August 27, 2007 at p. 147.

**13.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 33.

**14.** Deposition of Trent Smith taken August 27, 2007 at p. 145.

**15.** Deposition of Trent Smith taken August 27, 2007 at p. 145.

**16.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 34.

**17.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 34.

**18.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 36.

**19.** Deposition of Trent Smith taken August 27, 2007 at p. 174.

**20.** Plaintiffs' Appendix, Exhibit 201, Deposition of Jose De Jesus Hernandez at 21 (docket no. 112).

Target managers were instructed to check that workers were wearing uniforms and identification badges.[21] Local Target managers directed when workers were to arrive at the store to clean.[22] Jim's did not have any input on when workers were to arrive at a store.[23] Once inside a Target's store, workers were "locked in" and, absent a medical emergency, could not leave the premises.[24] Prior to being allowed to leave, a Target manager utilized a Target checklist[25] and insured himself that all items were completed and satisfactory before allowing workers to leave.[26]

Target's accountant's (Price Waterhouse) questioned Jim's about their payroll practices and Jim's informed them that employees were paid by the shift and that workers were being kept past regular shift times by Target managers.[27] Price Waterhouse reviewed and copied various employment related files that were in the possession of Jim's.[28] Target corporate officials were also made aware that Target managers were keeping workers past normal shifts.[29] Target managers notified their superiors that workers on occasion were not being paid timely and were only getting one day off every 15 days.[30] When Target received a wage complaint, it notified Jim's of the complaint and its contractual duty to comply with wage and hour laws.[31]

A Target "key carrier" was needed to allow the workers to exit the store.[32] Target held employees in the store on a frequent basis resulting in them working more than their scheduled number of hours.[33] Jim's had no authority to override any Target manager's decision to keep workers after their normal quitting time.[34] Target junior managers (known as LOD's) had an incentive to keep the workers in the store as long as possible and direct that cleaning work be redone because they wanted Target senior managers (known as STL's) to be impressed with how good the store looked.[35] Although

21. Plaintiffs' Appendix, Exhibit 27 (docket no. 110).

22. Deposition of Trent Smith taken August 27, 2007 at pp. 153–154; Plaintiffs' Appendix, Exhibit 203, Deposition of Alejandro Alcaraz at 12 (docket no. 112); Plaintiffs' Appendix, Exhibit 204, Deposition of Victor Alcaraz Ruiz at 16 (docket no. 112).

23. Deposition of Trent Smith taken August 27, 2007 at p. 154.

24. Deposition of Trent Smith taken August 27, 2007 at p. 155.

25. A factual dispute exists as to whether this form was promulgated by Target or was developed by Jim's and Target managers signed off on the form.

26. Deposition of Trent Smith taken August 27, 2007 at pp. 158–160; Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 49.

27. Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 50.

28. Deposition of James A. Funderburgh taken on August 28, 2007 at p. 71.

29. Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 50; Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 71–71–74.

30. Plaintiffs' Appendix, Exhibit 27 (docket no. 110).

31. Plaintiffs' Appendix, Exhibit 35 (docket no. 110).

32. Deposition of Trent Smith taken August 27, 2007 at p. 162.

33. Deposition of Trent Smith taken August 27, 2007 at pp. 169, 178.

34. Deposition of Trent Smith taken August 27, 2007 at p. 170; see also Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 88, 98–99.

35. Deposition of Trent Smith taken August 27, 2007 at p. 171.

Target managers would direct that cleaning work be redone or hold workers beyond regular hours, Jim's was unable to charge Target for any such work.[36] The entire Jim's cleaning crew (not just a Jim's team leader) walked the store with a Target store manager prior to being let out of the store.[37] It was not uncommon for Jim's employees to be held over at least a couple of times per week for 15 to 30 minutes.[38]

Target required workers to sign in on forms created by Target.[39] If employees did not individually sign in or incorrectly logged their time in and out, Target complained to Jim's.[40] Target managers directed when workers could take their breaks and meal.[41] Target managers provided Jim's with input as to which workers they liked and disliked and on occasion asked Jim's to fire certain workers.[42] Target insisted that Jim's have a minimum number of employees at the stores.[43] Although Target insisted upon more workers being placed in a store, they did not alter the compensation paid to Jim's.[44] In instances were Target wanted a worker removed,

Jim's was not allowed to move the worker to a different store location.[45] Target managers completed "work order action plans" that stated the following: Target employees could not communicate with crews because of their inability to speak English; crews were understaffed; employees were not checking in or out with the Target LOD; workers were taking excessive breaks or lunches.[46] Target promulgated numerous policies (often translated in Spanish) instructing workers on how to clean.[47]

After 2000/2001, Jim's was wholly dependent upon Target for its work.[48] About 70 percent of Jim's costs were attributable to payroll costs. Target unilaterally changed the timing of when it paid Jim's (from the third week of the month to 45 days after work was performed).[49] Prior to Target summarily terminating its agreements with Jim's, the prospective new contractor began notifying workers that they were taking over the stores and approached the workers about working for them.[50] Prior to notifying Jim's that their contract was being terminated, Target in-

**36.** Deposition of Trent Smith taken August 27, 2007 at p. 177.

**37.** Deposition of Scott Benson at pp. 100, 102–103.

**38.** Deposition of Scott Benson at p. 107.

**39.** Deposition of Trent Smith taken August 27, 2007 at p. 183.

**40.** Deposition of Trent Smith taken August 27, 2007 at p. 183.

**41.** Deposition of Trent Smith taken August 27, 2007 at p. 184; Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 82–84. But see Deposition of Scott Benson at p. 90 (work crews were coordinated merely to insure that Jim's cleaning crew would merely follow any Target employees doing stocking).

**42.** Deposition of Trent Smith taken August 27, 2007 at pp. 186–187;

**43.** Deposition of James A. Funderburgh taken on August 28, 2007 at p. 85.

**44.** Deposition of James A. Funderburgh taken on August 28, 2007 at p. 86.

**45.** Deposition of Trent Smith taken August 27, 2007 at p. 190.

**46.** Plaintiffs' Appendix 5d (docket no. 107).

**47.** Plaintiffs' Appendix 5d (docket no. 107).

**48.** Deposition of Trent Smith taken August 27, 2007 at p. 206.

**49.** Deposition of James A. Funderburgh taken on August 28, 2007 at pp. 61–63.

**50.** Deposition of Bryan Funderburgh taken on August 28, 2007 at p. 151.

formed its stores that floor chemicals, cleaning chemicals, floor pads, trash bags, red "Charlie carts," and wet dry vacuums were Target property and not to be removed by Jim's.[51] After Target notified Jim's that its contract was being unilaterally terminated, Jim's ceased actively doing business.[52]

It is uncontested that workers were not paid overtime by either Jim's or Target.[53]

## Analysis

### A. Fair Labor Standards Act (FLSA)

Section 206 of the FLSA requires covered employers to pay their nonexempt employees a minimum wage. Section 207(a) of the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a).

### B. Employer

■ The FLSA defines an "employer" in part, as "any person acting directly or indirectly in the interest of the employer." 29 U.S.C. § 203(d). Whether an entity is an employer for the purpose of the FLSA turns on the "economic reality" of the working relationship. *Goldberg v. Whitaker House Co–op., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). The determination of an employment relationship "does not depend on … isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

■ The Fifth Circuit has held that the FLSA's definition of "employer" is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir.1993) (*quoting Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 194–95 (5th Cir.1983)). The term "employer" under the FLSA "includes individuals with managerial responsibilities and substantial control over the terms and conditions of the [employee's] work." *Lee v. Coahoma County*, 937 F.2d 220, 226 (5th Cir.1991) (*quoting Falk v. Brennan*, 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973)); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir.1984) (observing that an individual qualifies as an employer if he "independently exercised control over the work situation").

### C. Joint Employer

■ The FLSA's definition of "employer" contemplates the possibility of multiple employers. A single individual may be the employee of two or more employers at the same time. The Department of Labor regulations state that a joint employment relationship exists when there is an arrangement between employers to share an employee's services; one employer is acting directly or indirectly in the interest of the other employer or employers in relation to the employee; the employers are associated with one another, directly or indirectly, with respect to the employment of the employee because one employer controls, is controlled by, or is under common control with the other employer. 29 C.F.R. § 791.2(b).

---

**51.** Plaintiffs' Appendix, Exhibit 21 (docket no. 109).

**52.** Deposition of James A. Funderburgh taken on August 28, 2007 at p. 7.

**53.** "They were expected to be able to perform the work they needed to perform in a 40–hour workweek." Deposition of Trent Smith taken August 27, 2007 at p. 133.

The "economic reality" test includes inquiries into: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).[54] The Fifth Circuit, however, has also applied a five-factor test. In *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668 (5th Cir.1968), the Court stated: "In considering whether a person or corporation is an 'employer' or 'joint employer', the total employment situation should be considered, with particular regard to the following questions: (1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment conditions of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?" *Wirtz*, 405 F.2d at 669. No one factor is determinative of whether a defendant is an "employer" under the FLSA.

Assuming there are no material facts in dispute, whether a party is a joint employer is a question of law. *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir.1986).

### D. Target's motion for summary judgment regarding Plaintiffs' FLSA claims (docket no. 81)

In this case, numerous fact issues exist. Although the agreement between Target and Jim's contemplated that the Plaintiffs were to be employees of Jim's, this fact alone is not dispositive. *See e.g., Flores v. Albertson's, Inc.*, 2003 WL 24216269 (C.D.Cal.2003).

Material fact issues exist regarding whether Target could fire workers, direct their day-to-day activities, and how much control Target exercised over the relationship with Jim's. Target argues that its limited control, which it exercised to prevent conflicts with its own operations, does not serve to make it a joint employer. However, the competent summary judgment evidence in this case goes beyond that. Target allegedly provided supplies, fired workers, complained when the workers were not in proper uniform, and kept workers beyond normal hours. Target maintained and enforced highly structured

---

**54.** There appears to be some difference among the circuit courts regarding factors a court should consider in determining joint employment under the FLSA. The First and Ninth Circuits have applied a four-factor test: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See e.g., Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir.1998); *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983).

The Second Circuit, on the other hand, has adopted a six-factor test: (1) whether the plaintiff used the entity's premises for his work; (2) whether the labor contractor had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiff performed a discrete line-job that was integral to the entity's process of production; (4) whether responsibility under the labor contract could pass from one subcontractor; (5) the degree to which the entity or its agents supervised the plaintiff's work; and (6) whether the plaintiff worked exclusively or predominantly for the entity. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir.2003) (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)).

policies on how cleaning was to be conducted, required purchases of expensive equipment, provided for cleaning budgets and delivery of cleaning equipment, and even translated documents for the use and training of workers. Target argues that its request to "fire" a worker did not preclude Jim's from transferring that worker to another Jim's client. The competent summary judgment evidence, however, demonstrates that at least after 2001/2002, Target knew that Jim's had no other clients. Accordingly, Target must have known that any request to "let go" a worker ultimately meant that worker lost his employment.

Target denies that it gave sufficient directions to the workers to establish that it controlled the worker's day-to-day duties. Target also evaluates the "economic reality" test and concludes that it is not an employer. Among other cases cited, Target most recently brings to the Court's attention a Maryland district court order in *Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762 (D.Md.2008). In that case, a contractor was hired by Regal Cinemas to clean its movie theaters. Like here, the contractor labeled its workers independent contractors and failed to pay overtime. The Court in *Quinteros* granted Regal Cinemas' motion to dismiss, stating that Sparkle dispatched the workers to the various theaters, the workers did not depend solely on the movie theaters for their work, Regal did not direct either hiring or firing, and if a concern was expressed about the quality of work, Regal would contact a Sparkle manager. The competent summary judgment advanced by the Plaintiffs in this case set forth material facts that directly challenge virtually all these issues.

Target's motion for summary judgment regarding Plaintiffs' FLSA claims (docket no. 81) is DENIED.

**E. Target's motion for summary judgment seeking dismissal of Elvia Riojas and Baudel Vasquez's FLSA claims because they were exempt employees.**

■ Target argues that these two employees were exempt managers. Target argues that they were paid $1,100 twice a month, they prepared payroll time sheets, interviewed, hired, trained and fired employees, recommended employees for promotion, and interacted with Target managers. Plaintiffs respond that they were mere conduits between Target managers and the workers. In addition, Plaintiffs argue that a significant portion of their work duties required the performance of cleaning/janitorial duties. Finally, the plaintiffs assert that they were not paid a gross pay amount of at least $455 per week in order to be exempt from FLSA provisions. Accordingly, they argue they are not exempt managers. The Court finds that fact issues exist as to whether these two workers were exempt. Specifically, fact issues exist as to what their "primary duties" were. Target's motion for summary judgment on this issue is DENIED.

**F. Plaintiffs' motion for partial summary judgment (document no. 85)**

Plaintiffs seek a ruling from this Court that Target was a "joint employer" of the workers in this case. In addition, they seek a ruling that Jim's was a "joint employer" of the workers in this case.

■ There is no serious argument made that the workers were not employees of Jim's. Jim's hired the workers, they wore Jim's uniforms, they received instruction from Jim's, and Jim's maintained their payroll records. Jim's acknowledges in its briefing (docket no. 119) that the workers should have been paid overtime and were

not. *See e.g., Quinteros v. Sparkle Cleaning, Inc.,* 532 F.Supp.2d 762 (D.Md.2008) (contractor hired by Regal Cinemas was employer of workers). Jim's, however, blames the necessity of any overtime hours on Target and insists that it alone is responsible for any outstanding wages due the Plaintiffs. Jim's fails to appreciate that if Target is indeed found to be an employer of these workers, it nevertheless is also an employer of these workers, and joint and several liability exists between Jim's and Target for any unpaid wages. 29 CFR § 791.2(a). Plaintiffs' motion for partial summary judgment requesting a finding that the plaintiffs were employees of Jim's is GRANTED.

Fact issues, however, exist as to whether Target is a "joint employer" of the Plaintiffs. Target maintains that it directed activities on a limited basis only to ensure that its business operations were not affected. Target denies that its managers directed day-to-day activities and asserts that such actions remained under the control of Jim's managerial employees. Target also asserts that Jim's could have diversified its client base, but chose not to do so and rather unwisely decided on a strategy to rely upon Target for its business. Plaintiffs' motion for partial summary judgment requesting a finding that the plaintiffs were employees of Target is DENIED.

### G. Target's motion to strike Plaintiffs' Reply (docket no. 131)

Target seeks to strike a reply brief filed by Plaintiffs because it was filed late and exceeded the page limit. The motion is DENIED.

### H. Joint Motion for Continuance (docket no. 134)

The parties jointly request that the Court continue the current trial setting to allow the parties to submit this matter to non-binding mediation. The motion is GRANTED. All current deadlines, including the pretrial conference and trial, are vacated. The parties shall submit this matter to a nonbinding mediation within the next 60 days. As soon as the mediation has been held, the parties should immediately inform the Court whether the matter has been settled or not. Thereafter, if necessary, the Court will issue a new scheduling order.

### CONCLUSION

Target's motion for summary judgment regarding Plaintiffs' FLSA claims (docket no. 81) is DENIED. Plaintiffs' motion for partial summary judgment (document no. 85) is GRANTED in part and DENIED in part. Specifically, Plaintiffs' motion for partial summary judgment requesting a finding that the plaintiffs were employees of Jim's is GRANTED. Plaintiffs' motion for partial summary judgment requesting a finding that the plaintiffs were employees of Target is DENIED. Target's motion to strike Plaintiffs' Reply (docket no. 131) is DENIED. The Joint Motion for Continuance (docket no. 134) is GRANTED. All current deadlines, including the pretrial conference and trial, are vacated. The parties shall submit this matter to a non-binding mediation within the next 60 days. As soon as the mediation has been held, the parties should immediately inform the Court whether the matter has been settled or not. Thereafter, if necessary, the Court will issue a new scheduling order.